Oliver J. H. Stiefel, OSB # 135436
Tel: (503) 227-2212
oliver@crag.org
Christopher G. Winter, OSB # 984355
Tel: (503) 525-2725
chris@crag.org
Crag Law Center
917 SW Oak St., Suite 417
Portland, Oregon 97205
Fax: (503) 296-5454

*Attorneys for Plaintiff Central Oregon LandWatch*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| **CENTRAL OREGON LANDWATCH**, an Oregon non-profit corporation;<br><br>Plaintiff,<br><br>v.<br><br>**SHANE JEFFRIES**, in his official capacity as Ochoco National Forest Supervisor; **JAMES M. PEÑA**, in his official capacity as Regional Forester for Region 6 of the United States Forest Service; and the **UNITED STATES FOREST SERVICE**, a federal agency of the United States Department of Agriculture,<br><br>Defendants,<br><br>**OCHOCO TRAIL RIDERS**, **OREGON MOTORCYCLE RIDERS ASSOCIATION**; **PACIFIC NORTHWEST 4 WHEEL DRIVE ASSOCIATION**, **DESCHUTES COUNTY 4 WHEELERS**; and **THE BLUERIBBON COALITION**,<br><br>Defendants-Intervenors. | Case No. 2:17-cv-01004-SU (Lead)<br>*Case No. 2:17-cv-01091 (Trailing)*<br>Case No. 2:17-cv-01366 (Trailing)<br><br><br>**CENTRAL OREGON LANDWATCH'S OBJECTIONS TO MAGISTRATE'S FINDINGS AND RECOMMENDATIONS** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

GLOSSARY OF TERMS ................................................................................... vi

INTRODUCTION ............................................................................................. 1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ........................................ 2

   I.   The OHV Project Would Impact Thousands of Acres of Habitat................................ 2

      A.   The OHV Project adds new routes and stream crossings in aquatic habitat. ...................... 3

         1.   Project Area streams suffer from degraded conditions and show no signs of improvement. ........................................................................................ 4

         2.   The OHV Project is a permanent source of aquatic habitat impacts. ................... 6

      B.   The OHV Project would increase route densities and motorized use within elk habitat. ........................................................................................... 7

   II.   The OHV Project Has Faced Significant Opposition and Judge Sullivan Recommends Vacatur of the Decision. ..................................................................... 9

      A.   The agency authorized the OHV Project despite unprecedented opposition. ..................... 9

      B.   Judge Sullivan recommends vacatur and remand of the OHV Project decision on claims related to the wolf and elk. .................................................................. 10

LEGAL BACKGROUND ..................................................................................... 12

   I.   National Environmental Policy Act ........................................................................ 12

   II.   National Forest Management Act........................................................................... 13

STANDARD OF REVIEW .................................................................................... 14

ARGUMENT.................................................................................................... 16

   I.   The Forest Service Failed to Disclose and Consider the OHV Project's Impacts on Redband Trout Habitat in a Manner Consistent With Its NEPA and NFMA Duties. ...... 16

      A.   The agency failed to take a hard look at the OHV Project's cumulative sediment impacts under NEPA. ....................................................................... 16

         1.   The agency failed to account for the impacts of aquatic habitat degradation from past activities. ............................................................................. 17

      a.   Data more than 10 years old does not reflect the impacts of recently completed activities. ................................................................................................ 17

      b.   Under Circuit precedent, the agency's data on baseline conditions was too stale to carry the weight assigned to it. .......................................................... 19

   2.   The information in the SFEIS does not account for the impacts of grazing and unauthorized OHV use. ........................................................................ 21

      a.   Grazing and unauthorized OHV use are widespread in the Project Area. ................. 21

      b.   The agency failed to consider impacts from past, present, and reasonably foreseeable grazing and unauthorized OHV use. ........................................ 22

  B.   The agency failed to demonstrate INFISH consistency. ......................................................... 25

   1.   The agency's INFISH analysis was deficient as a procedural matter, because the agency did not conduct watershed analyses .......................................................... 26

   2.   The agency failed to demonstrate consistency with RM-1. .................................................. 28

      a.   Short-term sediment impacts were not accounted for. ........................................... 28

      b.   Long-term sediment impacts were dismissed based on an arbitrary comparison. ....... 30

II.   The Agency Failed to Take a Hard Look at Impacts to Elk Security Habitat. ......................... 32

  A.   The agency's analysis of elk security habitat was fatally flawed. ........................................... 32

  B.   LandWatch's motion to supplement should be granted. ......................................................... 34

CONCLUSION .......................................................................................................................................... 35

OBJ. TO F&R—ii
*LandWatch v. Forson, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

# TABLE OF AUTHORITIES

## CASES

*Am. Rivers v. FERC,*
    201 F.3d 1186 (9th Cir. 2000) .......................................................................................... 13

*Asarco v. U.S. EPA,*
    616 F.2d 1153 (9th Cir. 1980) .......................................................................................... 15

*Camp v. Pitts,*
    411 U.S. 138 (1973) ........................................................................................................... 15

*Cascadia Wildlands v. U.S. BIA,*
    801 F.3d 1105 (9th Cir. 2015) .......................................................................................... 17

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004) ........................................................................................................... 12

*Idaho Conserv. League v. Bennett,*
    No. CV-04-447-S-MHW, 2005 U.S. Dist. LEXIS 35356 (D. Idaho April 29, 2005) ...................... 28

*Idaho Rivers United v. Probert,*
    No. 3:16-cv-00102-CWD, 2016 U.S. Dist. LEXIS 63767 (D. Idaho May 12, 2016) ...................... 25

*Idaho Sporting Cong. v. Rittenhouse,*
    305 F.3d 957 (9th Cir. 2002) ............................................................................................ 13

*Kern v. U.S. BLM,*
    284 F.3d 1062 (9th Cir. 2002) .......................................................................................... 21

*Klamath Siskiyou Wildlands Ctr. v. U.S. Forest Serv.,*
    373 F. Supp. 2d 1069 (E.D. Cal. 2004) ........................................................................... 30

*Klamath-Siskiyou Wildlands Ctr. v. U.S. BLM,*
    387 F.3d 989 (9th Cir. 2004) ............................................................................................ 21

*Lands Council v. McNair,*
    537 F.3d 981 (9th Cir. 2008) ....................................................................................... 13, 20

*Lands Council v. Powell,*
    395 F.3d 1019 (9th Cir. 2004) ................................................................................. 14, 15, 19

*League of Wilderness Def. v. U.S. Forest Serv.,*
    No. cv-03-1563-AS, 2005 U.S. Dist. LEXIS 30718 (D. Or. June 6, 2005) ....................... 30

*League v. Connaughton,*
    752 F.3d 755 (9th Cir. 2004) ............................................................................................ 20

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

*League v. Connaughton,*
   No. 3:12-cv-02271-HZ, 2014 U.S. Dist. LEXIS 170072 (D. Or. Dec. 9 2014) ............................... 35

*Marsh v. Or. Natural Res. Council,*
   490 U.S. 360 (1989) .................................................................................................................. 15

*Mountaineers v. U.S. Forest Serv.,*
   445 F. Supp. 2d 1235 (W.D. Wash. 2006) ............................................................................... 16

*Mtr. Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
   463 U.S. 29 (1983) .................................................................................................................... 15

*N. Idaho Cmty. Action Network v. U.S. DOT,*
   545 F.3d 1147 (9th Cir. 2008) .................................................................................................. 12

*N. Plains Res Council v. STB,*
   668 F.3d 1067 (9th Cir. 2011) ...................................................................................... 19, 20, 21

*Native Ecosystems Council v. U.S. Forest Serv.,*
   418 F.3d 953 (9th Cir. 2005) ................................................................................................ 28, 32

*Neighbors of Cuddy Mtn. v. U.S. Forest Serv.,*
   137 F.3d 1372 (9th Cir. 1998) .................................................................................................. 21

*Or. Nat. Res. Council Fund v. Brong,*
   492 F.3d 1120 (9th Cir. 2007) .................................................................................................. 34

*Or. Natural Res. Council Fund v. Goodman,*
   505 F.3d 884 (9th Cir. 2007) .................................................................................................... 32

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.,*
   265 F.3d 1028 (9th Cir. 2001) .................................................................................................. 30

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) .................................................................................................................. 12

*San Luis & Delta-Mendota Water Auth. v. Locke,*
   776 F.3d 971 (9th Cir. 2014) .................................................................................................... 34

*Siskiyou Reg'l Educ. Proj. v. U.S. Forest Serv.,*
   565 F.3d 545 (9th Cir. 2009) .................................................................................................... 14

*Te Moak Tribe v. U.S. DOI,*
   608 F.3d 592 (9th Cir. 2010) .................................................................................................... 23

*WildEarth Guardians v. Mont. Snowmobile Ass'n,*
   790 F.3d 920 (9th Cir. 2015) ........................................................................................ 13, 33, 34

## STATUTES

5 U.S.C. § 706 .................................................................................................................. 15

16 U.S.C. § 1531 ................................................................................................................ 1

16 U.S.C. § 1600 ................................................................................................................ 2

16 U.S.C. § 1604 .............................................................................................................. 13

28 U.S.C. § 636 ............................................................................................................. 1, 14

33 U.S.C. § 1313 ................................................................................................................ 6

42 U.S.C. § 4321 ................................................................................................................ 2

42 U.S.C. § 4332 .............................................................................................................. 12

## REGULATIONS

36 C.F.R. Part 218 ............................................................................................................. 9

36 C.F.R. § 220.4 ............................................................................................................... 9

40 C.F.R. § 1500.1 ........................................................................................................... 13

40 C.F.R. § 1502.16 ......................................................................................................... 13

40 C.F.R. § 1502.24 ......................................................................................................... 13

40 C.F.R. § 1508.7 ....................................................................................................... 13, 16

40 C.F.R. § 1508.8 ........................................................................................................... 13

40 C.F.R. § 1508.25 ......................................................................................................... 13

OBJ. TO F&R—v
*LandWatch v. Forson, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

## GLOSSARY OF TERMS

| Agency | United States Forest Service |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| DEIS | Draft Environmental Impact Statement |
| CEQ | Council on Environmental Quality |
| CWA | Clean Water Act |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| Ex. | Exhibit |
| FEIS | Final Environmental Impact Statement |
| F&R | Findings and Recommendations |
| FWS | United States Fish and Wildlife Service |
| INFISH | Inland Native Fish Strategy |
| LandWatch | Central Oregon LandWatch |
| LWD | Large Woody Debris |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NMFS | National Marine Fisheries Service |
| m | Meters |
| mi | Miles |
| $mi/mi^2$ | Miles per Square Mile (a unit of measure used to calculate route density) |
| MIS | Management Indicator Species |
| ODFW | Oregon Department of Fish and Wildlife |
| OHV | Off-highway Vehicle |
| OHV Project | Ochoco Summit Trail System Project |
| ONF or Ochoco | Ochoco National Forest |
| RHCA | Riparian Habitat Conservation Area |
| RMO | Riparian Management Objective |
| ROD | Record of Decision |
| Route | Road or OHV Trail |
| SDEIS | Supplemental Draft Environmental Impact Statement |
| SFEIS | Supplemental Final Environmental Impact Statement |
| SUPP | Supplemental Administrative Record |
| t. | Table |

OBJ. TO F&R—vi
*LandWatch v. Forson, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

Pursuant to 28 U.S.C. § 636(b)(1) Central Oregon LandWatch ("LandWatch") hereby submits its Objections to the Findings and Recommendations ("F&R") issued by Judge Sullivan on August 27, 2018. ECF89.[1]

## INTRODUCTION

This case challenges the U.S. Forest Service's ("Forest Service" or "agency") decision to authorize an Off-Highway Vehicle ("OHV") trail system in the Ochoco National Forest ("Ochoco") in Central Oregon (the "OHV Project"). Construction of the OHV routes and their ongoing motorized use would cause irreversible damage to aquatic and upland habitats that are critical to the survival and conservation of numerous fish and wildlife species. LandWatch's case centers on the impacts to three species: Rocky Mountain elk ("elk"), Redband trout, and Gray wolves ("wolves"). Elk and Redband trout are designated as Ochoco Management Indicator Species ("MIS") because their well-being serves as a barometer for the health of other species with similar habitat requirements. Wolves are listed under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*

Over the OHV Project's long administrative history, consensus emerged between nearly every user group of the Ochoco, the Oregon Department of Fish and Wildlife ("ODFW"), and hunting, community, and conservation groups alike that the Forest Service failed to discharge its substantive and procedural duties in reviewing and approving the OHV Project. This broad opposition stemmed from the agency brushing aside significant environmental concerns, failing to provide substantive protections for fish and wildlife habitat, and relying on untested assumptions about patterns of OHV use. In detailed F&R, Judge Sullivan largely agreed. Concluding that the agency "committed multiple substantive errors, as to multiple statutes, regulations, and rules," ECF89 at 49, Judge Sullivan recommends vacatur and remand of the decision.

---

[1] Citations to the docket are to the lead case, No. 2:17-cv-01004-SU, to the ECF pagination. Citations to the record are to the Administrative Record ("AR") and the Supplemental Administrative Record ("SUPP"). A Table of Citations is appended to LandWatch's briefing at ECF55 and 77, with a crosswalk between all cited documents and their location in the AR or SUPP.

OBJ. TO F&R—1
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

LandWatch agrees that the decision should be vacated and the Forest Service made to reconsider the OHV Project's impacts on elk and wolves, as Judge Sullivan recommends. In all but one narrow respect—related to the Forest Service's analysis of elk security habitat—Judge Sullivan correctly resolved the issues related to elk and wolves under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*, and the ESA.

LandWatch respectfully asks this Court to modify the F&R with respect to the NEPA and NFMA issues related to Redband trout and aquatic habitat. As discussed in more detail below, the Forest Service's planning documents are riddled with gaps and holes, and its conclusions therefore lack a rational basis. The agency's decision to add a major new trail system for OHVs—which would cause permanent detrimental impacts to already degraded aquatic habitat—lacks support in the record and cannot survive arbitrary and capricious review.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following facts are relevant to LandWatch's limited objections to the F&R. The record contains detailed recitations of the facts of this case. *See, e.g.*, ECF57 at 14–23; ECF77 at 9–11.

## I.      The OHV Project Would Impact Thousands of Acres of Habitat.

In a June 2017 Record of Decision ("ROD"), which was based on analysis contained in a September 2016 Supplemental Final Environmental Impact Statement ("SFEIS"), the Forest Service approved a major new OHV trail system on the Ochoco. The Selected Alternative (Alternative 5 plus one route from Alternative 2) designates 137 miles of motorized trails for OHV use, and involves new construction, re-opening roads currently designated as "closed," and opening roads previously planned for decommissioning. *See* AR28735–37.[2]

---

[2] The agency also described "concealment, rehabilitation, or restoration of unauthorized and unwanted routes" as a feature of the OHV Project, AR25252, but did not identify the location or quantity of routes, a plan for carrying out these activities, or a dedicated funding source for doing so.

OBJ. TO F&R—2
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

In Central Oregon, there are approximately 1,000 miles of specially designated OHV routes, AR12124, on top of many more thousands of miles of roads open to OHV use. AR26452. In the 301,580-acre Project Area, there are already 659 miles of roads open to OHV use. AR25472 (t. 130), 25283 (t. 8). Additionally, there are more than 700 miles of unauthorized OHV routes, some of which are user-created trails, and others of which are on administratively "closed" roads. AR25303. The use of unauthorized routes is unlawful under the Ochoco Travel Management Plan, AR12689, but many closed roads and user-created trails receive motorized use. AR26746.

Although there are considerable opportunities for OHV users in and around the Project Area, these users comprise a very small subset of Ochoco users. Most visitors to the Ochoco "participate in non-motorized activities," AR25659, and cite wildlife viewing, camping, fishing, and hunting as their top picks for recreation. AR25659–60; *see also* AR26496 (chart of primary uses of the Ochoco). In contrast, OHV users comprise only about 3% of users on the Ochoco. AR25660.

The impacts of OHV users, however, are disproportionately large. Construction and use of OHV routes create a host of disturbances to aquatic habitat—including increased sediment delivery. AR26853. Motorized use of OHV routes substantially increases movement rates by elk, causing a series of cascading effects including higher stress levels and reduced productivity. AR26930.

Despite the abundance of OHV routes in Central Oregon, the relatively low volume of OHV users and their disproportionate impacts, the Forest Service authorized an OHV trail system that, according to ODFW, "effectively occupies half of the Ochoco and will likely negatively impact non-motorized recreation activities throughout the area." AR24343.

A.    **The OHV Project adds new routes and stream crossings in aquatic habitat.**

The Project Area contains approximately 138 miles of fish-bearing streams within nine subwatersheds, AR25365, with many streams supporting populations of Redband trout (*Onchorincus mykiss gairneri*). AR25348. Redband trout are a subspecies of Rainbow trout native to the Columbia

OBJ. TO F&R—3
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

Basin east of the Cascade Crest. AR26856. Designated both as an Ochoco MIS, and a "Sensitive

Species," ECF23, 27, ¶ 179,[3] Redband trout populations "are generally healthy in streams with year

around flow, instream cover, suitable water temperatures, clean spawning gravel, and an intact

riparian zone. In streams where these habitat components are lacking, trout populations are

significantly reduced * * *." AR18257; *see also* AR25465.

### 1.     Project Area streams suffer from degraded conditions and show no signs of improvement.

LandWatch's expert Amy Stuart was the principal author of a comprehensive inventory of

fish populations in the Crooked River basin (of which the Project Area is a part), which found that

"the current conditions of most streams in the Crooked River basin are degraded, and fish habitat

and production are substantially diminished from historical times." SUPP1649–50.[4] Crooked River

Redband trout populations are considered to be depressed to less than 10% of historical numbers.

AR25465. Habitat degradation has resulted from a number of sources; documenting conditions in

one of the Project Area subwatersheds, Ms. Stuart explained, "the cumulative impacts of the

extensive road network (open, closed, and decommissioned), illegal motorized user trails, and

livestock grazing have already compromised Deep Creek and its tributaries with high sediment loads,

poor riparian conditions, and high summer temperatures." AR26859.

For its assessment of the aquatic habitat "baseline"—ostensibly the condition of Project

Area streams—the agency relied on limited data from stream surveys measuring nine habitat

indicators (habitat features): shade, water temperature, bank stability, fine sediment, physical barriers,

---

[3] "Sensitive Species" are those "[p]lant or animal species which are susceptible or vulnerable to activity impacts or habitat alterations * * * recognized by the Regional Forester as needing special management protection to prevent placement on Federal or State lists." AR1850; *see also* AR1750.

[4] Ms. Stuart is a fisheries biologist with over 34 years of experience, including 30 years with ODFW. *See* AR26833–95.

OBJ. TO F&R—4
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

large woody debris, pool frequency, pool quality, and width/depth ratios. AR25355. The agency

lacked current data for the great majority of stream segments that the OHV Project would impact.

The vast majority of the surveys—more than 90%—were 10 or more years old.[5] More than

75% of the surveys were from the previous century—more than 17 years old.[6] There also were

major gaps in the survey data: the SFEIS lists 1,600 possible data points for habitat indicators other

than temperature and physical barriers, but the agency lacked any data for approximately 600 of

those data points, nearly 40%.[7] ODFW expressed serious concerns about these gaps, stating that the

"physical data that was used was extremely limited and in many cases outdated." AR15228.

Since the majority of the surveys were conducted, the Project Area has been subject to

continued land management activities that are known to degrade aquatic habitat. The SFEIS lists ten

logging projects that occurred in the 2000s. AR25343. A series of additional logging projects were

approved between 2011 and 2016 and are in various stages of implementation. *See* AR26845;

AR25277–79. Grazing occurs annually across the Project Area in 25 allotments. AR25342. Ongoing

OHV use occurs on closed roads and user-created routes. *See* AR14791; AR25342.

As the Forest Service notes, "[c]hanges in discharge, bank stability, sediment load and/or

bedload can rapidly alter the width and/or depth of the channel." AR14670. Grazing, logging, and

OHV use are primary sources of rapid degradation. AR26900; AR14787 (unauthorized OHV use

continues to deliver sediment to streams and cause watershed damage). As ODFW pointed out: "If

changes can rapidly alter [stream channels], then using data up to 23 years old does not describe the

current condition." AR20839.

---

[5] *See* AR25369–401 (Tables 70–71, 74–75, 77–78, 80–81, 83–84, 87–88, 90–91, 93–94, 97–98). Of the surveys for non-temperature habitat indicators, 218 of 246 (89%) were pre-2008, *i.e.*, 10 years old. Of the temperature surveys, 84 of 88 (95%) were pre-2000.

[6] *See id.* (showing 184 of 246 the non-temperature surveys—75%—and 70 of the 88 temperature surveys—80%—were pre-2000).

[7] *See id.* (taking into account data points for shade, bank stability, fine sediment, large woody debris, pool quality, and width/depth ratios).

Notwithstanding the missing and stale data, the agency still rated aquatic habitat as "fair/poor in a majority of the project subwatersheds * * *." AR25353. Streams are compromised with elevated sediment loads; for all streams for which there is data, fine sediment levels are above 20%—the level above which severe consequences for Redband trout are expected to occur. AR26863, 26865. 13 Project Area streams are listed as water quality impaired under Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), due to high temperatures. AR25402. As ODFW summarized, "significant water quality impacts are currently occurring," and conditions are likely worse than presented in the SFEIS, given the stale data. AR15228.

### 2.    The OHV Project is a permanent source of aquatic habitat impacts.

On top of this degraded baseline, the OHV Project adds 17.3 miles of new routes within 300 feet of streams. AR25444. OHVs driving on gravel and dirt roads create a disturbance to route surfaces that causes sedimentation in streams. AR25352. The OHV Project also involves 79 stream crossings—where routes cross streams by fords or bridges, or where routes are constructed over streams by use of culverts—bringing the total number of Project Area stream crossings to 571. AR25445, 25443. Stream crossings are a major vector for sediment delivery. AR26902. Stream crossings widen stream channels by obliterating stream banks, AR26852; bank erosion can account for most of the sediment load in a drainage system. AR25358.

Increased sediment delivery affects nearly all habitat indicators. Increased sediment above natural levels causes aggradation—*i.e.*, the filling of streambeds. Aggradation leads to the filling of pools, which results in a decline of pool frequency and volume. AR26837. Reducing pool volume reduces hiding cover, nesting, and feeding areas for aquatic organisms. AR25402. The reduction of pool volume and widening of stream channels increases stream temperatures. *Id.*; *see also* AR26920. Increased sediment delivery also increases turbidity and fine sediment levels. AR26910. Fine

OBJ. TO F&R—6
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

sediment particles can clog the gills of fish; promote excessive algae growth; reduce dissolved

oxygen; and impair visibility, making it more difficult to feed. AR26853, 26864.

On account of the predictable impacts to aquatic habitat, ODFW told the Forest Service

that the "OHV project could significantly move redband trout towards a loss of population

viability." AR20840. While the agency acknowledged that the OHV Project "would result in more

effects to the streams and watersheds within the [Project Area]" as compared to the No Action

Alternative, AR25440, overall, the agency concluded that impacts to aquatic habitat would be *de

minimis*. AR25466; AR25403 ("insignificant" amounts of sediment delivery). ODFW disagreed:

> Redband trout populations are currently vulnerable due to impacts from livestock
> grazing. Trout productivity is limited by excessive sediment load in streams from
> unstable banks reducing spawning success and limiting macroinvertebrate
> production. This condition will be exacerbated by additional sediment resulting from
> construction and use of trails in each of the action alternatives.

AR15229; *see also* AR24341 (OHV Project would "continue further degradation of habitat and stress

sensitive fish populations").

**B.      The OHV Project would increase route densities and motorized use within
        elk habitat.**

Rocky Mountain elk (*Cervus Canadensis nelsoni*) are a big game species designated as an

Ochoco MIS. AR25498; AR399. Many different habitats are crucial to elk survival, including calving

grounds to give birth, open foraging areas to find food, wallow areas to attract mates, and concealed

security habitat to provide hiding cover. ECF23, 27 ¶ 120. This Objection focuses on the OHV

Project's impact on elk security habitat.

The presence of motorized routes on the landscape fragments elk habitat, and the use of

these routes impacts elk movement. Studies consistently show that motorized recreational activities

have a substantial effect on elk behavior. SUPP429. Elk are highly susceptible to noise impacts—

especially from OHV use—and may respond by moving long distances, leaving areas that lack

sufficient cover. AR25515, 25512. Flight responses as a reaction to OHV use cause a reduction in

OBJ. TO F&R—7
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

feeding time, depleting fat reserves needed for over-winter survival. AR25516. In areas of higher route densities, elk exhibit higher levels of stress and increased movement rates. AR5709. Elk seek areas of "security" habitat—composed of structural and functional cover such as forested stands— to hide from perceived threats. AR26930.

The Forest Service defined "security" habitat as forested stands greater than 250 acres in size and greater than ½ mile from an open route. AR25513 (relying on *Hillis*, AR26751). The SFEIS discloses that there would be 42,431 acres of security habitat after implementation, and the agency concluded that the OHV Project would not negatively affect elk population numbers. AR25778.

There are two fundamental problems with the analysis of elk security habitat. First, the agency assumed that every acre outside the 1/2–mile "distance band" is forested and would provide security habitat, but it never examined whether this is actually the case. In fact, this area of Central Oregon contains many non-forested habitat types. The SFEIS discloses that nearly 80,000 acres (26%) of the Project Area is non-forested, AR25335, with over 40,000 acres of shrub-scabland habitat, an open habitat type characterized by rocky, shallow soils. AR25616. Moreover, the forested areas in the Ochoco are known for the "diversity of the vegetation," AR232, with forested stands juxtaposed with other habitat types. AR231. According to the SFEIS, "[m]ost of the project area is scab stringer terrain; this terrain typically has an average of 30 percent scabland plateaus dissected by timbered stringers." AR25335. The agency never assessed whether these mixed habitats would provide functional security habitat. *See* SUPP19581 (key factor affecting elk security habitat is vegetation density).

Second, the agency ignored entirely over 700 miles of unauthorized OHV routes, many of which are receiving motorized use. AR25532, 25303. Instead, the security habitat analysis only accounts for "administratively open" roads, AR25518, which only covers a fraction of the total route

OBJ. TO F&R—8
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

system. A map prepared by ODFW shows that roads traverse at least some portion of every area the

Forest Service labeled "security habitat." AR26738–39.

## II.    The OHV Project Has Faced Significant Opposition and Judge Sullivan Recommends Vacatur of the Decision.

### A.    The agency authorized the OHV Project despite unprecedented opposition.

The Forest Service began the scoping process in 2009, AR8578; 36 C.F.R. § 220.4(e),

identifying four significant issues for study during the NEPA process, including (1) impacts on water

quality and degradation of fish habitat, and (2) impacts on big game habitat. AR25232–34. The

agency's DEIS received 234 separate comments. The FEIS and draft ROD received 24

administrative objections. *Id.*; *see also* 36 C.F.R. Part 218. LandWatch, ODFW, community members,

hunters, and other organizations told the agency that the OHV Project should not move forward

until the agency collects baseline data on existing conditions, including the miles of closed roads and

user-created trails receiving motorized use. *See, e.g.*, AR17725 (picture of road marked as

administratively "closed" that is clearly receiving motorized use). In July 2014, the agency withdrew

the draft ROD. ECF23, 27 ¶ 78.

Despite the significant opposition to the OHV Project during the first administrative

process, the agency returned to the public with essentially the same proposal in an SDEIS in

February 2016. The agency did not update its analysis of baseline conditions, relying on the same

outdated information as the first round for significant issues like road densities, elk special habitats,

and aquatic habitat indicators. This time, the agency received over 1,100 comments. AR25728. The

agency released its SFEIS and draft ROD in September 2016 and received 28 separate objections—

the most ever received by the Ochoco for a site-specific project. ECF23, 27 ¶ 80.

LandWatch timely filed comments and objections during the NEPA processes. *See*

AR15280, 17670, 24187, 26760. ODFW also "participated in every phase and consistently

OBJ. TO F&R—9
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

recommended [Ochoco] select Alternative 1 or No Action Alternative." AR26728; *see also* AR15225; AR20836; AR24340. ODFW cited "serious concerns" about negative impacts to fish and wildlife resources that were not adequately addressed by the Forest Service's NEPA review. *See id.* ODFW told the agency that the project is "premature," and that there was a need to first undertake "a comprehensive assessment to address impacts and identify strategies for mitigating impacts to fish and wildlife resources from the entire system of roads and trails and the associated motorized use by the public." AR8940.

Although it acknowledged various gaps in the underlying analysis, the agency moved forward without reconciling the substance of the 28 objections, AR28093–94, instead pledging future monitoring and mitigation during implementation. AR28782–83.

**B.    Judge Sullivan recommends vacatur and remand of the OHV Project decision on claims related to the wolf and elk.**

LandWatch, whose members include local community members, former Forest Service employees who worked on the initial phases of the OHV Project, hunters, and fishers, timely filed suit on July 13, 2017. The case was consolidated with sister suits brought by a coalition of environmental organizations and the Oregon Hunters Association. ECF13. OHV interests intervened on behalf of the Forest Service. ECF35. ODFW participated in the case as *amicus curie* in support of Plaintiffs. ECF54, 76. The Parties filed cross-motions for summary judgment and a hearing was held on May 22, 2018. The transcript is attached to these objections as Exhibit A.

On August 27, 2018, Judge Sullivan issued the F&R, ECF89, recommending vacatur and remand of the OHV Project decision. ECF89 at 50. Regarding LandWatch's three principal issues, Judge Sullivan recommends granting LandWatch's summary judgment motion on claims related to the wolf and elk, and denying the summary judgment motion on claims related to Redband trout and aquatic habitat. Judge Sullivan also denied LandWatch's motion to supplement the administrative record with two maps depicting elk security habitat, under both the ESA and APA.

OBJ. TO F&R—10
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

More specifically, Judge Sullivan correctly recommends granting LandWatch's summary judgment motion on its ESA claim that the Forest Service's "no effect" conclusion and decision to forgo Section 7 consultation was arbitrary and contrary to the ESA. ECF89 at 13–16. Judge Sullivan found sufficient grounds in the record to decide in LandWatch's favor. *Id.*; *see also* ECF89 at 10.[8]

Judge Sullivan also recommends granting in part LandWatch's summary judgment motion on its NFMA and NEPA claims related to the OHV Project's impacts on elk, on three issues.

- First, Judge Sullivan correctly decided that the Forest Service failed to explain under NFMA how the OHV Project is consistent with the Ochoco Forest Plan's provisions protecting elk special habitats—wallows and calving areas. ECF89 at 20–22.

- Second, Judge Sullivan correctly decided that the Forest Service failed to take a "hard look" under NEPA at wallows and calving sites because it failed to collect baseline data and failed to articulate how those habitats would be protected during implementation. ECF89 at 30–31.

- Third, Judge Sullivan correctly decided that the Forest Service failed to take a "hard look" under NEPA at elk security habitat vis-à-vis user-created routes and route densities. ECF89 at 29–30. On LandWatch's other arguments related to elk security habitat, Judge Sullivan decided that the agency's analysis was sufficient under NEPA. ECF89 at 27–30, 33–34.

LandWatch respectfully asks this Court to modify the F&R related to elk security habitat, to hold that the agency failed to take a hard look beyond just the route density issue. Because the elk security habitat maps are helpful for resolution of this issue, LandWatch objects to Judge Sullivan's denial of the motion to supplement under the APA.

On LandWatch's claims related to Redband trout and aquatic habitat, Judge Sullivan decided in favor of the Forest Service, on three issues:

- The Forest Service's presentation of the environmental baseline was adequate under NEPA. ECF89 at 36–37.

---

[8] The elk security habitat maps are admissible for reviewing the ESA claim, and LandWatch respectfully objects to the denial of the motion to supplement for the reasons stated in its briefing. ECF55, 74. Because LandWatch agrees with Judge Sullivan's resolution of the merits of the ESA claim, LandWatch does not discuss the issue further, but preserves its objection.

OBJ. TO F&R—11
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

- The Forest Service's cumulative effects analysis—the impacts from past, present, and reasonably foreseeable future activities—was adequate under NEPA. ECF89 at 37–38.

- The Forest Service complied with INFISH Standards and Guidelines. ECF89 at 41–44.[9]

LandWatch respectfully objects to Judge Sullivan's resolution of these three limited issues. For purposes of streamlining the arguments for this Objection, LandWatch has combined its claims related to the failure to collect baseline data, *see* ECF57 at 36–38, ECF77 at 26–29, and the failure to consider the impacts of past activities, ECF57 at 38, ECF77 at 23, because both these claims rest on the same underlying premise: the agency's data in the record does not accurately represent the environmental baseline. Because the aquatics issues comprise the bulk of these Objections, LandWatch addresses them first in the Argument section below.

## LEGAL BACKGROUND

### I.    National Environmental Policy Act

NEPA is our nation's charter for protecting the environment. *N. Idaho Cmty. Action Network v. U.S. DOT*, 545 F.3d 1147, 1153 (9th Cir. 2008). NEPA and Council on Environmental Quality regulations set forth "action-forcing" procedures designed to ensure that an agency takes a "hard" look at detailed information concerning significant environmental impacts, while guaranteeing that the relevant information will be made available to the public so it may play a role in both the decisionmaking process and the implementation of the decision. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–51 (1989); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004).

In particular, NEPA requires federal agencies to prepare a detailed Environmental Impact Statement for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. §§ 4332(2)(C). The environmental consequences section of the EIS "forms the scientific

---

[9] Judge Sullivan also addressed impacts to the Lower Deep Creek Subwatershed in a separate section of the F&R. LandWatch in briefing and at oral argument used this subwatershed as an illustrative example, but did not raise any separate NEPA claims related to this subwatershed. LandWatch withdrew its "priority watersheds" claim under NFMA. ECF77 at 34 n.11.

OBJ. TO F&R—12
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

and analytic basis" for the evaluation of a project, and requires an agency to fully and fairly discuss direct and indirect environmental impacts, as well as any means to mitigate adverse impacts. 40 C.F.R. § 1502.16.[10] The agency must also consider the "cumulative effects" of a project, 40 C.F.R. § 1508.25, which are the impacts "on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions * * *." *Id.* § 1508.7. As a starting point for the analysis, the agency must collect data on baseline conditions; an accurate and complete baseline, against which to compare the potential impacts of a project, is "critical" to the NEPA process. *Am. Rivers v. FERC*, 201 F.3d 1186, 1195 & n.15 (9th Cir. 2000).

In carrying out its NEPA duties, an agency must ensure scientific integrity, 40 C.F.R. § 1502.24, and disseminate high quality information to the public. *Id.* § 1500.1(b); *see also WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015).

## II.    National Forest Management Act

"NFMA sets forth the statutory framework and specifies the procedural and substantive requirements under which the Forest Service is to manage National Forest System lands." *Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (*en banc*). NFMA requires the Forest Service to develop, maintain, and revise a forest plan for each National Forest. 16 U.S.C. § 1604(a). "In order to ensure compliance with the forest plan and [NFMA], the Forest Service must conduct an analysis of each 'site-specific' action * * * to ensure that the action is consistent with the forest plan." *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 962 (9th Cir. 2002); *see also* 16 U.S.C. § 1604(i).

The agency here had a duty to demonstrate the OHV Project is consistent with the Standards and Guidelines of the Ochoco Forest Plan. Courts treat forest plan provisions as equivalent to federal regulations under the APA. *Siskiyou Reg'l Educ. Proj. v. U.S. Forest Serv.*, 565 F.3d

---

[10] "Direct effects are those effects "which are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8. "Indirect effects" are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.*

OBJ. TO F&R—13
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

545, 555 (9th Cir. 2009). The Ochoco Forest Plan incorporates the Standards and Guidelines of the Inland Native Fish Strategy ("INFISH"). *See* AR2546; ECF23, 27 ¶ 184.

INFISH was adopted to reduce risks to native fish populations like Redband trout, and it creates "buffer zones in Riparian Habitat Conservation Areas [RHCAs] where INFISH standards limit timber harvest and minimize road construction to lessen sediment delivery into streams." *Lands Council v. Powell*, 395 F.3d 1019, 1033 (9th Cir. 2004). Within these buffer zones, INFISH provides "quantifiable measures of stream and streamside conditions that define good fish habitat," called "Riparian Management Objectives" ("RMOs"). AR2679. INFISH sets RMOs for six habitat indicators: (1) pool frequency, (2) water temperature, (3) large woody debris, (4) bank stability, (5) lower bank angle, and (6) width/depth ratio. AR2564. RMOs are considered the best watershed scale information available, and "provide the criteria against which attainment or progress toward attainment of [INFISH] goals is measured." AR2564. Applicable to the OHV Project, Standard RM-1 requires the Forest Service to:

> Design, construct, and operate recreation facilities, including trails and dispersed sites, in a manner that does not retard or prevent attainment of the [RMOs] and avoids adverse effects on inland native fish. Complete watershed analysis prior to construction of new recreation facilities inside [RHCAs] within priority watersheds.

AR2571. To "retard" means to slow the rate of recovery below the near natural rate of recovery if no additional human caused disturbance was placed on the system." AR2565. "Adverse effects" include short- or long-term management-related impacts of an individual or cumulative nature, such as mortality, reduced growth, or other adverse physiological or behavioral changes." AR2672. "Watershed analysis" is a procedure for gathering critical baseline information. AR2637, 2683.

## STANDARD OF REVIEW

Under the Federal Magistrates Act, this Court reviews *de novo* the portions of a magistrate judge's findings and recommendations to which objection is made. 28 U.S.C. § 636(b)(1)(C). This Court "may accept, reject, or modify, in whole or part the findings and recommendations made by

the magistrate judge," and "may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*; *see also* FED. R. CIV. P. 72(b)(3).

LandWatch's claims are governed by the APA, which directs courts to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Agency action is arbitrary and capricious where the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Mtr. Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). While review under the arbitrary and capricious standard is narrow, a court's inquiry must be "searching and careful," and must "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

In general, review under the APA is limited to the administrative record that was before the agency at the time it made its decision. *See Camp v. Pitts*, 411 U.S. 138, 141–42 (1973). The Ninth Circuit recognizes exceptions to the "record review rule," however, because it is both unrealistic and unwise to "straightjacket" the reviewing court with the administrative record. *Asarco v. U.S. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980). To properly evaluate agency decisionmaking under the APA, the reviewing court may go outside the record (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision; (2) if the agency has relied on documents not in the record; (3) when supplementing the record is necessary to explain technical terms or complex subject matter; and (4) when plaintiffs make a showing of agency bad faith. *Lands Council I*, 395 F.3d at 1030. This Court reviews the magistrate's order on the motion to supplement for clear error. FED. R. CIV. P. 72(a).

///

///

OBJ. TO F&R—15
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

## ARGUMENT

**I.    The Forest Service Failed to Disclose and Consider the OHV Project's Impacts on Redband Trout Habitat in a Manner Consistent With Its NEPA and NFMA Duties.**

It is undisputed that the streams flowing through the nine Project Area subwatersheds exhibit uniformly poor conditions. On top of this degraded baseline, the OHV Project would be a chronic source of sediment that would combine with past, present, and future activities in the Project Area that have, and continue to adversely impact aquatic habitat.

Judge Sullivan erred in upholding the Forest Service's analysis of impacts to aquatic habitat under NEPA and NFMA. The agency concluded that the OHV Project's impacts would be *de minimis*, but its analysis and conclusions were arbitrary and capricious in two fundamental respects. First, the Forest Service failed to account for important aspects of the problem when measuring cumulative sediment delivery. Second, the Forest Service's conclusion that the OHV Project would satisfy substantive INFISH standards lacked a rational basis.

### A.    The agency failed to take a hard look at the OHV Project's cumulative sediment impacts under NEPA.

To comply with NEPA, an agency must measure the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. As courts have made clear, it "is the **additive** effect of both agency and other actions taken together that constitutes the gravamen of appropriate cumulative impacts analysis under NEPA." *Mountaineers v. U.S. Forest Serv.*, 445 F. Supp. 2d 1235, 1248 (W.D. Wash. 2006) (emphasis added).

The Forest Service concluded that the additive impacts to aquatic habitat would be immeasurable. *See* AR25456 (no measurable increased cumulative effects to sediment regime). LandWatch challenges two principal aspects of the agency's analysis and conclusions on cumulative impacts. First, the agency's analytical approach for assessing past impacts was premised on a clear error of judgment: although the agency purported to rely on data on current conditions as a "proxy"

OBJ. TO F&R—16
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

for the impacts of past actions, its data on "current" conditions was either non-existent or stale. In other words, the data relied on by the Forest Service to represent the impacts of past actions either did not exist, or actually was collected **before** those actions took place. Second, the agency failed to take a hard look at the impacts from the present and reasonably foreseeable future actions of grazing and unauthorized OHV use.

1.     **The agency failed to account for the impacts of aquatic habitat degradation from past activities.**

Judge Sullivan correctly identified that the Ninth Circuit permits an agency to meet its obligation to consider the cumulative impacts of past actions by using an "aggregate" approach: "An agency may * * * satisfy NEPA by aggregating the cumulative effects of past projects into an environmental baseline, against which the incremental impact of a proposed project is measured." ECF89 at 38 (citing *Cascadia Wildlands v. U.S. BIA*, 801 F.3d 1105, 1111 (9th Cir. 2015)). Judge Sullivan concluded that the agency satisfied this standard by "using **current** environmental conditions as a proxy for the impacts of past actions." *Id.* (citing AR25275–76) (emphasis added). That is not what the agency did. On this limited issue, Judge Sullivan misapprehended the record.

a.     **Data more than 10 years old does not reflect the impacts of recently completed activities.**

Although the Forest Service purported to rely on data on "current environmental conditions" as a proxy for the impacts of past actions, the actual data does not support this statement. As described above, the vast majority of the agency's surveys are more than ten years old. *See supra* page 5. In fact, 75% of the surveys are from the 1990s. The record simply does not contain reliable data on current environmental conditions.

The record makes plain that there have been a host of activities since the surveys were conducted that are known to impact aquatic habitat, including logging, grazing, and OHV use. AR26900, 26906–11; SUPP 22192–97; *see also* AR26845 (SFEIS listed but failed to evaluate impacts

OBJ. TO F&R—17
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center
917 SW Oak St. Suite 417
Portland, OR 97205
Tel. (503) 525-2722*

from land management activities over past 16 years). The Forest Service never explained how its

stale survey data remained reliable in the face of the past and ongoing habitat-degrading activities.

For example, "a single season of grazing can greatly reduce bank stability and increase width/depth

ratio." AR26900. Where grazing has continuously occurred across the landscape, surveys from the

1990s cannot adequately represent current conditions. Nor does the stale baseline data capture

significant impacts from recent unauthorized OHV use, despite the acknowledgement that this use

continuously is having a detrimental impact on aquatic habitat. *See, e.g.*, AR25405 (sediment impacts

from existing user-created trails).

On top of that, the agency lacked any data—stale or otherwise—for a significant fraction of

habitat indicators for key stream segments. *See supra* page 5. For example, the SFEIS presents zero

baseline data for fine sediment, pool quality, and width/depth ratios in the Howard Creek

subwatershed. AR25375. For Elliot Creek, the agency had only three data points for fine sediment,

three for pool quality, and one for width/depth ratios—out of 24 possible data points. AR25371–72.

The agency never made any attempt to reconcile the wide swaths of missing data.[11]

One concrete example helps illustrate this point. According to the baseline data, Reach 2 of

Elliot Creek does not meet the relevant thresholds for shade, temperature, large woody debris, and

pool frequency. AR25371 (row 2 of Table 74). No data was provided for fine sediment, pool quality,

or width/depth ratios. *Id.* Data indicates that the relevant threshold for bank stability was met, *id.*,

but the data is from a survey undertaken in 1996—20 years before the publication of the SFEIS.

The agency, however, acknowledges that habitat-degrading activities have continued to

occur: a 2010 site visit revealed that "[s]treambanks were impacted by grazing with postholing,

---

[11] Judge Sullivan noted that the agency relied on a general "stream condition" framework for
each subwatershed—a qualitative habitat assessment. *See, e.g.*, AR25373 (Elliot Creek). No showing
was made as to how this assessment accurately reflects current conditions. As ODFW noted, "the
Elliot Creek subwatershed includes 7 named and other unnamed stream channels, and yet the
overall condition of the subwatershed was assessed using data * * * from one stream." AR15228.

hedged alder, and removal of riparian vegetation. * * * Sediment deposition on the substrate indicates continuous sediment inputs from cut streambanks." *Id.* But the SFEIS fails to provide any more recent data, and thus fails to account for current conditions. For instance, if in 2010 the "cut streambanks appeared to be sheered by livestock as recognized by their footprints," *id.*, is it still the case that the bank stability threshold is met? As explained by Ms. Stuart, "[s]treambank cutbanks are another bank stability parameter that empirically demonstrates poor stream condition * * *. Streams with higher levels of bank instability have higher amounts of fine sediment." AR26863.

> **b.    Under Circuit precedent, the agency's data on baseline conditions was too stale to carry the weight assigned to it.**

The Ninth Circuit in at least two cases has held that an agency acts arbitrarily where the data on which it relies is too stale to carry the weight assigned to it. *See N. Plains Res Council v. STB*, 668 F.3d 1067, 1086 (9th Cir. 2011); *Lands Council I*, 395 F.3d at 1031.

In *Northern Plains*, the agency relied on surveys that "were conducted many years ago," and the court held that the reliance on the stale data, without any updates to the data based on additional studies or surveys, did not constitute a hard look as required under NEPA. *Id.* at 1086; *see also id.* (faulting agency for failing to adequately update 10+ year old survey data with more recent data).

In *Lands Council I*, the Ninth Circuit rejected the agency's reliance on surveys of habitat conditions that were 13 years old:

> Evidence of the current habitat conditions, and any degradation or improvement in the last 13 years, is relevant evidence in analyzing and determining what, if any, impact the current Project will have on the cumulative effect of current and past timber harvesting on trout habitat and on trout population. Instead the Forest Service predicted the Project's impact on the Westslope Cutthroat Trout (and its habitat) using stale habitat data.

*Id.*[12]

---

[12] There, like here, the agency also relied on more recent, but still outdated, fish count surveys. The court found these surveys "unavailing," and reliance on them suspect without more recent data on **habitat conditions**. *Id.*

OBJ. TO F&R—19
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

These cases are directly on point, but Judge Sullivan did not address this controlling Ninth Circuit precedent. Instead, Judge Sullivan faulted LandWatch for failing to show that the survey and monitoring data was "incorrect." ER89 at 37 (citing *League v. Connaughton*, 752 F.3d 755, 763 (9th Cir. 2004)). As described above, there is extensive evidence in the record demonstrating that activities occurring since the majority of the surveys were conducted have impacted aquatic habitat in the Project Area. The Forest Service never explained how the impacts of these past activities could be represented by stale data collected years before those activities took place.

On this fact pattern, it was error to shift the burden to LandWatch to demonstrate that the data was "incorrect," where the record so clearly demonstrates that the data was stale. In the face of the stale data, it was the **agency's burden**, to show that its data was reasonably reliable and accurate. *See N. Plains*, 668 F.3d at 1084 (agency failed to cite any scientific studies or testimony in support of its reliance on the stale data); *see also McNair*, 537 F.3d at 994 (agency must support its conclusions with studies that the agency deems reliable). The court in *Connaughton* acknowledged that in some contexts, "NEPA's 'hard look' requirement requires agencies to conduct new scientific studies in order to fully and fairly analyze the impacts of a particular project." 752 F.3d at 763.[13]

"[W]ithout [baseline] data, an agency cannot carefully consider information about significant environmental impacts. Thus an agency fails to consider an important aspect of the problem, resulting in an arbitrary and capricious decision." *N. Plains*, 668 F.3d at 1085. Here, the agency's attempt to rely on data on the environmental baseline as a proxy for the impacts of past actions categorically failed because the agency's data simply did not reflect the impacts of many activities

---

[13] In any event, *Connaughton* is distinguishable as a factual matter. There, the Forest Service relied on a study showing that bull trout had been extirpated from a particular watershed. The court deferred to the agency's reliance on this study—even though it was outdated—because there was no evidence showing that bull trout had returned to the watershed in question in the intervening time. Here, Defendants cannot make a straight-faced argument that there is no evidence that land management activities in the Project Area in the past 20 years—grazing, OHV use, logging, road building—have contributed to aquatic habitat degradation.

OBJ. TO F&R—20
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

occurring since 2000. *See* AR26731 (ODFW: "Without current data, it is impossible to adequately assess the impacts of increased sedimentation to fish populations").

> **2.    The information in the SFEIS does not account for the impacts of grazing and unauthorized OHV use.**

According to the Ninth Circuit, a cumulative impacts analysis must contain some "quantified or detailed information." *Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1379–80 (9th Cir. 1998). "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Id.*[14] Here, the SFEIS provides no quantified or detailed information on the cumulative effects of two activities that are pervasive and ongoing in the Project Area, and which are known to adversely impact aquatic habitat: grazing and unauthorized OHV use. The Forest Service failed to take a hard look at the impacts from past, present, and future grazing and unauthorized OHV use.

> **a.    Grazing and unauthorized OHV use are widespread in the Project Area.**

The record conclusively shows that grazing and unauthorized OHV use have contributed, and will continue to contribute negative impacts to Project Area aquatic habitat, particularly with respect to sediment delivery. *See* AR26859 (cumulative impacts of illegal motorized trails and grazing have contributed to high sediment loads).

Table 171 of the SFEIS shows that 7,507 cattle and sheep are permitted under 25 allotments within the Project Area. AR25633–34; AR25602 ("Cattle grazing occurs on most of the project area * * *."). "[L]ivestock grazing, even in the absence of other impacts, elevates fine sediment levels in streams." AR26908. As recognized by the Forest Service, "[g]razing patterns in and around riparian areas can alter the vigor, composition, and amount of natural vegetation [which] in turn can

---

[14] *Accord Klamath-Siskiyou Wildlands Ctr. v. U.S. BLM*, 387 F.3d 989, 993 (9th Cir. 2004); *Kern v. U.S. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2002).

affect the site's ability to control erosion, provide stability to stream banks, and provide shade and cover to the stream." AR2636; *see also* AR26906 ("[G]razing greatly elevates sediment delivery to streams via several mechanisms, including direct bank damage from trampling, loss of bank stability, gullying, loss of soil cover, increased runoff due to soil compaction, and vastly elevated levels of channel erosion, which deposits sediment directly into streams."). Surveys conducted in the Project Area have revealed severely degraded habitat conditions from grazing: "Cattle damage is extreme on the creek. Banks have sloughed off into the channel. Banks are trampled and lack definition, causing heavy sediment to the stream." AR16897.

The SFEIS also acknowledges that there are approximately 700 miles of unauthorized OHV routes in the Project Area. AR25303; AR25617 (admission by Forest Service that unauthorized use occurs on "many miles" of closed roads). "User-created trails that have been created over time do not have proper drainage, are not maintained, and cross over a larger portion of the landscape including across streams." AR25444. The agency admits that these routes "will continue to contribute sediment." AR25405; *see also* AR26909 ("Sediment delivery from user-created routes contributes to cumulative sediment delivery.").

>           b.      **The agency failed to consider impacts from past, present, and reasonably foreseeable grazing and unauthorized OHV use.**

Judge Sullivan signed off on the Forest Service's analysis of cumulative effects to aquatic habitat without reconciling the major analytical gaps in the assessment. Despite the known impacts, the SFEIS did not account for grazing and unauthorized OHV use in its cumulative effects analysis. *See* AR26906–11 (describing cumulative sediment delivery from unauthorized OHV use and grazing that should have been taken into account).

With respect to past impacts, the agency is either missing key data for the environmental baseline or the data is stale. Thus, the agency's data does not reflect current conditions, and therefore, could not serve as a proxy for past impacts. *See supra* pages 5, 17–19.

OBJ. TO F&R—22
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

With respect to impacts from ongoing and future grazing and unauthorized OHV use, Judge Sullivan's review of the record was inaccurate. For one, the Forest Service **did not** consider grazing or unauthorized OHV use in its quantitative estimates of sediment delivery. The agency admits this fact. AR25810 ("The modeled rates of sedimentation are based on natural erosive processes and do not take into account other land management activities such as grazing, timber harvest, and recreation development * * *."); AR25765, 25766; AR25785.[15]

Judge Sullivan cited the SFEIS's quantitative assessment of road/trail densities and stream crossings, ER89 at 38 (citing AR25447–66), but that analysis only accounted for impacts from road building associated with vegetation management projects—not grazing or unauthorized OHV use. *See* AR25457 (explaining that the assessment was based on "miles of planned road construction and road decommissioning"). In sum, the SFEIS provides no quantitative assessment of the impacts from ongoing and future grazing and unauthorized OHV use.

Nor does the SFEIS provide any detailed information on these activities. Indeed, the cumulative effects section of the SFEIS is completely silent as to the **impacts** from ongoing unauthorized OHV use. *See* AR25447–66. The SFEIS makes passing reference to the fact that some unspecified number of unauthorized routes would be rehabilitated or restored, as funding allows. AR25462. As Judge Sullivan recognized, the "SFEIS does not indicate when or how this would occur." ER89 at 24. Thus for some unauthorized routes, impacts will continue to occur until rehabilitation or restoration is effectively completed—an unspecified amount of time.

The Forest Service admits that a substantial fraction of unauthorized OHV routes will not be subject to rehabilitation or restoration because they fall outside of a designated "management

---

[15] Judge Sullivan cited the agency's quantitative analysis of the sediment impacts from the proposed OHV trail system, ER89 at 38, but those **direct effects** are irrelevant to the cumulative effects analysis. *See Te Moak Tribe v. U.S. DOI*, 608 F.3d 592, 604 (9th Cir. 2010) (holding that a discussion of direct effects in lieu of a discussion of cumulative effects is inadequate under NEPA).

OBJ. TO F&R—23
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

area." AR25472; AR28720 (map showing that the management areas comprise only a small fraction of the project area); AR26739 (map showing high volume of closed and decommissioned roads outside of the management areas). Accordingly, cumulative impacts from unauthorized routes across thousands of acres of the Project Area will continue to occur, but the SFEIS provides no detailed disclosure and consideration as required by NEPA.[16]

With respect to grazing, the SFEIS disclosed that the Project Area is located within 25 active grazing allotments, which are "currently" grazed by cattle and sheep. AR25633. Although the agency admitted that cattle "would continue to have an effect on riparian soils" in the Project Area, AR25342, the SFEIS provides no detailed analysis on what these effects would be. In upholding the cumulative effects analysis, Judge Sullivan cited one sentence from the SFEIS where the agency observed that the management of grazing has improved and that "active rehabilitation of user-created trails would make them less usable to cattle." ER 89 at 38 n.16 (citing AR25456). It is entirely unclear how this statement says anything about how past, ongoing, and future grazing has and will affect Project Area subwatersheds, let alone why it constitutes a "hard look." Indeed, there is no discussion of continued sediment delivery, alteration of stream banks, increased runoff, or channel erosion, despite these being known consequences of grazing in riparian areas. *See* AR26906.

The relevant question is this: on what basis could the agency determine that cumulative impacts would be "immeasurable," when it did not in fact measure cumulative impacts from grazing and unauthorized OHV use? Without any quantitative or detailed information on the impacts of grazing and unauthorized OHV use, the agency failed to account for important aspects of the

---

[16] On the one hand, Judge Sullivan held that it was arbitrary for the Forest Service to exclude the 700 miles of user-created routes from the road density analysis. ER89 at 24–25. But on the other hand, Judge Sullivan upheld the Forest Service's cumulative effects analysis that did not analyze the impacts from these 700 miles of routes at all. There can be no dispute that the agency must account for these impacts in its cumulative effects analysis. *See* 40 C.F.R. § 1508.7 (agency must address cumulative impacts of actions regardless of what agency or person undertakes such actions).

OBJ. TO F&R—24
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center
917 SW Oak St. Suite 417
Portland, OR 97205
Tel. (503) 525-2722*

problem, a hallmark of arbitrary and capricious decisionmaking. *See Idaho Rivers United v. Probert*, No. 3:16-cv-00102-CWD, 2016 U.S. Dist. LEXIS 63767, at *36–38 (D. Idaho May 12, 2016) (cumulative effects analysis arbitrary and capricious where agency's quantitative estimate of sediment delivery did not take into account cumulative sediment delivery, and no other section of the EIS provided a hard look at cumulative effects from adjacent logging activities in the project area.)

      **B.**    **The agency failed to demonstrate INFISH consistency.**

      The Forest Service summarily determined that the OHV Project complied with INFISH's Standards and Guidelines, in particular, RM-1, but its INFISH analysis and conclusions are arbitrary and contrary to NFMA. The record in this case is clear: the construction of a major new OHV trail network in and around aquatic habitat would cause significant short- and long-term impacts. *See* AR20841 (ODFW: "The proposed OHV system will further stress these redband trout populations by * * * compromising the hydrology and stability of stream systems"). Without reconciling the plain facts about impacts from 17.3 miles of routes in the riparian corridor and 79 stream crossings bleeding sediment into Project Area streams, the agency offered the bare conclusion that the OHV Project would have "no measurable impact" on Redband trout habitat. AR25446. This conclusion is unsupported by the record.

      As an initial matter, the agency lacked the appropriate starting point for its analysis because it failed to undertake watershed analyses. This Court may remand on this procedural issue alone, a simple and efficient vehicle for resolving the INFISH claim. It is addressed first, below. This may obviate the need for a ruling on LandWatch's substantive INFISH claim because the Forest Service would be required to revise its analysis in a manner consistent with its INFISH obligations.

      Addressing the substantive INFISH issues would be instructive, however. A searching and careful review of the record reveals that the agency failed to consider the relevant factors and provide a rational explanation for its conclusion that the OHV Project complies with the substantive

OBJ. TO F&R—25
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

management protections of INFISH.

> **1.    The agency's INFISH analysis was deficient as a procedural matter, because the agency did not conduct watershed analyses.**

Degradation of aquatic habitat is the sum of its parts; in particular, all sources of sediment delivery, added to natural background conditions, affect the quality of aquatic habitat. AR24341 (degraded habitat "is manifested in streams through poor width/depth ratios, high sediment load and elevated temperatures, resulting from the cumulative impacts of past and present livestock grazing, timber harvest, and high road density"). INFISH's primary mechanism for gathering this critical baseline information is the watershed analysis. AR2576–77 (describing watershed analysis). The Forest Service here was required to conduct watershed analyses because it failed to otherwise gather sufficient watershed or stream-reach specific data for Project Area subwatersheds.

Specifically, INFISH requires the agency to complete watershed analyses before modifying any RMOs, unless the agency obtains "watershed or stream reach specific data" and provides "rationale supporting the change." AR2564. Here, however, the Forest Service modified the RMOs for width/depth ratios, LWD, and stream temperature, but did not obtain any site-specific data— through watershed analysis or otherwise. AR25355–60. The modification of the width/depth ratio RMO serves as the prime example.

The INFISH RMO is "below 10"—based on the mean wetted width of a stream, divided by its mean wetted depth. AR2566. Accordingly, if a stream is 20 feet wide on average, it should be more than 2 feet deep on average to exhibit healthy width/depth conditions. The Forest Service, however, modified the RMO, citing "width/depth ratios used by *Rosgen* for classification of primary stream types." AR25361; *see also* SUPP940. *Rosgen* is a universal stream classification system that has nothing to do with "local geology, topography, climate, and potential vegetation," as pointed out by

OBJ. TO F&R—26
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

LandWatch's expert Jonathan Rhodes during the administrative process.[17] AR26901. *Rosgen* merely classifies streams by channel type, SUPP941, and does not provide measurements of "good habitat," which is the purpose of the RMOs. AR2564.

As one illustrative example, the Forest Service set "above 12" as the threshold for "properly functioning" width/depth ratios for "C-type" channels. As Mr. Rhodes pointed out, using this metric leads to absurd results: a highly degraded C-type channel with a width/depth ratio as high as 100 would therefore qualify as "properly functioning." AR26901–02. And it had a practical impact on the analysis: the agency concluded that width/depth ratios in Porter Creek were in "good to fair condition," AR25383–84, even though half of the data points showed width/depth ratios above 25.

The Forest Service did not explain how the reliance on a general stream classification system that does not incorporate any "watershed or stream reach specific data," and which is uncorrelated to healthy habitat conditions, could serve as the basis for modification of the width/depth RMO in the absence of watershed analysis. In fact, the agency admitted that modification should be based on surveys for "reference reaches within the same channel types and hydro-physiographic regions," in order to "determine appropriate ranges." AR25361. But the agency conceded, "this data is unavailable for streams in the Ochoco Summit project area" because "collecting the reference reach data is an intensive process." *Id.* INFISH speaks of no "difficulty exception." The agency may modify the RMOs only after watershed analysis or where watershed or stream reach specific data supports the change.

In upholding the RMO modifications, Judge Sullivan relied on the general standard of review under NFMA, whereby a court asks whether the agency relied on studies that it deemed to be reliable. But the Forest Plan itself imposes additional procedural safeguards: the plain language of INFISH says the Forest Service must have "watershed or stream-reach specific data." AR2564. As

---

[17] Mr. Rhodes is a hydrogeologist with over 30 years of experience. AR26897–95.

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

the Ninth Circuit has made clear, "an agency's position that is contrary to the clear language of the Forest Plan is not entitled to deference." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 963 (9th Cir. 2005).

Here, in the absence of watershed analyses, or stream-reach specific data, the agency had no basis for modifying the RMOs. AR2564. Courts in similar contexts have held agency action to be arbitrary and capricious. *See* ECF57-5 at 29–30 (agency arbitrarily modified RMOs in the absence of site-specific data or Watershed Analysis).[18] Vacatur and remand is necessary so that the agency can re-assess INFISH compliance using the right metrics for assessing habitat conditions.

### 2.    The agency failed to demonstrate consistency with RM-1.

As a substantive matter, the Forest Service's INFISH consistency determination lacked a rational basis, for two principal reasons. First, while the record shows heavy short-term, construction-related impacts, the agency arbitrarily disregarded these impacts in its INFISH analysis. Second, the Forest Service summarily concluded that the OHV Project would comply with INFISH RM-1's duty to not "retard or prevent attainment of the Riparian Management Objectives or adversely affect inland native fish," AR2549, 2571, but this conclusion rested on the arbitrary finding that the OHV Project's sediment delivery would be insignificant.

### a.    Short-term sediment impacts were not accounted for.

The record demonstrates that building stream crossings (culverts, bridges, etc.) and excavating trails in riparian corridors would degrade aquatic habitat. As the agency admits: "Short-term sediment inputs from trail construction, especially at stream crossings, may have negative effects during construction when turbidity is high. These negative effects may include fish displacement during times of high turbidity, limiting feeding, and possible mortality." AR25446; *see*

---

[18] ECF57-5 is *Idaho Conserv. League v. Bennett*, No. CV-04-447-S-MHW, 2005 U.S. Dist. LEXIS 35356 (D. Idaho April 29, 2005).

OBJ. TO F&R—28
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

*also* AR25460 (acknowledging that fish habitat would be affected by filling of pools and gravels used by fish); *see also id.* ("Constructing trails in RHCAs and installing culverts increases sedimentation into streams during the life of construction until high flows can flush the sediment.").

Increased sediment delivery would retard the width/depth ratio RMO in affected streams. AR26919. Additionally, increased width/depth ratios—*i.e.*, stream widening—elevates summer water temperatures, thus retarding the temperature RMO. AR26920. The acknowledged short-term impacts are "both adverse and serious, clearly indicating that adverse impacts on redband trout have not been avoided under any of the action alternatives." AR26919–20.

The Forest Service never reconciled how these short-term impacts are consistent with INFISH. Judge Sullivan noted that steps would be taken to "minimize sediment delivery," ER89 at 43, but "minimization" is not the INFISH standard. Confusingly, Judge Sullivan later determined that the "analysis of water quality, particularly with regard to sediment and stream crossings, adequately meets INFISH standard, but falls short of the minimization standard required by the TMR." ER89 at 47. INFISH's standard is substantive: "Actions that reduce habitat quality, whether existing conditions are better or worse that objective values, would be inconsistent with the purpose of [INFISH]. Without the benchmark provided by measurable RMOs, habitat suffers a continual erosion." AR2565.[19]

It is arbitrary and capricious for the Forest Service to ignore short-term impacts in making its INFISH determination, as this district court has already determined. *See* ECF57–6 ("The Forest Service violated [NFMA] by approving implementation of Bandit II without first establishing that short-term adverse impacts of the project on redband trout and short-term retardations of RMOs

---

[19] Nor did the Forest Service make an explicit finding that the short-term impacts were in service of long-term habitat benefits, and thus permissible under INFISH. Accordingly, this case is easily distinguishable from *League v. U.S. Forest Serv.*, 445 F. Supp. 2d 1186, 1199 (D. Or. 2006), where the court accepted the agency's explanation that the short-term negative effects were **necessary** to manage and restore the area for long-term habitat recovery.

OBJ. TO F&R—29
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

set forth in INFISH would be consistent with the Ochoco forest plan.");[20] *see also Klamath Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069, 1093 (E.D. Cal. 2004) (agency failed to show how a project's short-term sediment impacts would comply with regional water quality/aquatic habitat strategy analogous to INFISH, in violation of NFMA). Because the Forest Service failed to address the known short-term impacts of route construction in aquatic habitat its INFISH determination must be remanded.

### b.    Long-term sediment impacts were dismissed based on an arbitrary comparison.

With respect to the OHV Project's long-term impacts, the agency's determination of INFISH consistency lacked a rational basis. This is particularly evident with regard to impacts from sediment delivery, which the agency dismissed based on an arbitrary comparative analysis.

In its analysis of sediment delivery, the agency simply compared the OHV Project's sedimentation to "natural background" conditions. AR25403 (dismissing impacts to width/depth ratios and pools based on the fact that the OHV Project "would contribute insignificant amounts of sediment" as "compared to natural background sedimentation"); AR25460. Problematically, the agency never explained why this comparative analysis makes any difference for purposes of INFISH. It simply shows that the OHV Project's sediment delivery may be relatively small as compared to the landscape-level sediment delivery that results from the natural erosive properties of the Project Area. In a similar context, the Ninth Circuit has held that it is unlawful for an agency to minimize the environmental impact of an activity by simply adopting a scale of analysis so broad that it marginalizes the site-specific impact of the activity on ecosystem health. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035–37 (9th Cir. 2001) ("*PCFFA*"); *see also* ECF57–6 at 15–17 (applying *PCFFA* to INFISH claim).

---

[20] ECF57–6 is *League of Wilderness Def. v. U.S. Forest Serv.*, No. cv-03-1563-AS, 2005 U.S. Dist. LEXIS 30718 (D. Or. June 6, 2005)

OBJ. TO F&R—30
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

The INFISH determination is to be made based on a "thorough analysis" of whether a project would slow the rate of recovery below the near natural rate of recovery, "if no additional human disturbance was placed on the system." AR2565. Standards and Guidelines like RM-1 apply to "stream channels, riparian areas, and watersheds." AR2628. The INFISH analysis, therefore, must begin with an inventory of current conditions, relative to the RMOs. Are streams currently meeting RMOs, and if not, how far out of compliance are they? *See* AR26897–99 (explaining how the agency could not properly measure INFISH consistency without taking into account cumulative impacts). From there, the agency must measure a project's **additive** impacts.

Here, according to ODFW, many streams already contain unhealthy levels of fine sediment (above 20%), AR26733, and "fail to meet the [RMOs] identified in the * * * INFISH standards and guidelines. AR15230. On top of the already degraded baseline, the OHV Project would be a new, "permanent disturbance." AR26731. "Installing 137 miles of permanent OHV trails including 39 new stream crossings as proposed in Alternative 5 will only increase sedimentation." AR26733; *see also* AR20842 (ODFW: "[s]oil disturbance associated with construction of bridges, culverts, fords and miles of trails both inside and outside of riparian areas will severely impact redband trout").

The agency never evaluated the impact to the RMOs from the new, permanent source of sediment delivery, despite the fact that sedimentation influences nearly every RMO. For example, "[i]ncreases in width/depth caused by elevated sediment delivery increases water temperatures even in the absence of shade loss." AR26899. Instead, the agency arbitrarily dismissed the OHV Project's sediment impacts as insignificant by way of comparison to natural background conditions.

The conclusion that the OHV Project would not retard or prevent attainment of the RMOs or adversely affect native fish therefore lacked a rational basis. *See* AR20845–46 (ODFW explaining how the Forest Service fails "to recognize the ongoing and continuing impact to streams already compromised and exceed[ing] INFISH standards, and disregards the ongoing and continuous

OBJ. TO F&R—31
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

impact of a much expanded road and trail network that will add even more sediment than is already

occurring on the landscape"). The failure to provide a rational explanation for INFISH consistency

was arbitrary and contrary to NFMA. *See Native Ecosystems*, 418 F.3d at 963 (reviewing court must be

able "reasonably to ascertain from the record" that the Forest Service is in compliance with the

relevant forest plan standards).

## II.    The Agency Failed to Take a Hard Look at Impacts to Elk Security Habitat.

Judge Sullivan correctly determined that the agency failed to take a hard look at impacts to

elk security habitat because it failed to account for all motorized routes. LandWatch respectfully asks

this Court to modify the F&R to hold that the agency failed to take a hard look at all elements of

OHV Project's impacts on elk security habitat—not solely with respect to motorized route density.

### A.    The agency's analysis of elk security habitat was fatally flawed.

As discussed above, the agency's assessed impacts to elk security habitat by measuring the

acreage of habitat blocks greater than ½ mile from administratively open routes. Although the

Forest Service disclosed that there would be 42,321 acres of elk security habitat in the Project Area

after implementation, this metric did not provide the public and decisionmaker with a full and fair

accounting of the OHV Project's impacts.

For one, as Judge Sullivan correctly decided, the agency failed to account for impacts to elk

security habitat vis-à-vis **all** motorized routes, as opposed to **only** administratively open roads.

ECF89 at 29.[21] The failure to consider other important aspects of the problem was just as blatant.

Most notably, the agency did not account for the actual habitat conditions of the acres of

alleged elk security habitat, which likely led to a significant overestimation. As *Hillis* confirms, elk

security habitat must comprise **forested stands**, or otherwise provide functional habitat. AR26752–

---

[21] Judge Sullivan also noted that the agency "may have an obligation to consider connectivity
of elk patches," ER89 at 33, and LandWatch agrees. *See Or. Natural Res. Council Fund v. Goodman*, 505
F.3d 884, 892 (9th Cir. 2007).

OBJ. TO F&R—32
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

53. Where cover is poor and terrain is gentle, a distance of greater than ½ mile from roads may be required before elk security habitat is effective. AR26734. Judge Sullivan noted that the agency relied on studies other than *Hillis* in its analysis, but these studies actually confirm that "heavily roaded areas may contain few patches of **forest cover** large enough to function effectively as habitat for elk, especially where elk are hunted." AR5709. The Forest Service offered no other basis to support its approach of counting all acres—regardless of habitat type—as "elk security habitat."

Here, the agency apparently assumed that all habitat blocks outside of the 1/2-mile distance band were forested and would provide security habitat, but never reconciled that assumption with actual habitat conditions. For one, as described above, more than 25% of the Ochoco is comprised of non-forested habitats, and even the forested areas may not provide effective cover because of their patchy juxtaposition. *See supra* page 8, *see also* AR25335; *cf. Guardians*, 790 F.3d at 925 (NEPA violation where EIS failed to provide information on the location of big game winter range, or the concentration of game in each area). The map at ECF52-3 (Special Habitats and Alt 5 Elk Security Habitat) shows that many of the areas the Forest Service counted as "security" habitat in fact are comprised of non-forested habitats, including Sage/Scab, Grassland, and Rock.

Moreover, the agency did not address how elk security habitat would be impacted by the combined and synergistic impacts of past, present and future vegetation management projects. Vegetation management activities have or will impact several hundred thousand acres of the Project Area, *see* AR25324, 25613; AR26947, and the agency admitted that the effects of these activities may limit the amount or effectiveness of elk security habitat. AR25531. Indeed, logging activities reduce valuable cover and render areas unusable to elk, SUPP19582, including by "decreasing canopy layering and complexity." AR25531. The map at ECF53-2 (Past, Present, and Future Actions and Alt 5 Elk Security Habitat) shows that nearly every acre of "security" habitat has or will be impacted by vegetation management projects. The SFEIS, however, contains no quantified or detailed

information about how the amount, location, or quality of the alleged 42,321 acres of alleged elk

security habitat would be impacted by these vegetation management projects.

Judge Sullivan noted the SFEIS's separate discussion of "habitat effectiveness indices"

("HEIs"). ER89 at 33 (citing AR25531–32). No showing was made by the agency as to how its

analysis of HEIs was relevant to the disclosure that there would be 42,431 acres of elk security

habitat in the Project Area following implementation of the OHV Project.[22] The agency's failure to

disclose and consider how the impacts of the overlapping projects would combine with the impacts

of the OHV Project to affect elk security habitat violated NEPA. *See Or. Nat. Res. Council Fund v.*

*Brong*, 492 F.3d 1120, 1133 (9th Cir. 2007) (NEPA violation where agency failed to "consider the

interaction of multiple activities").

### B.    LandWatch's motion to supplement should be granted.

To help bring the elk security habitat issues into sharper focus, LandWatch moved to

supplement the record with two maps depicting factors the agency failed to disclose and consider.

This Court may "consider extra-record evidence to develop a background against which it can

evaluate the integrity of the agency's analysis." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776

F.3d 971, 993 (9th Cir. 2014). Judge Sullivan committed clear error in denying the motion to

supplement; LandWatch respectfully refers this Court to the detailed arguments as to why the map

falls squarely within the first and third exceptions to the record review rule. ECF52, 74.

Judge Sullivan's primary basis for denying supplementation was that the maps were "created

after the administrative process." ECF89 at 9. It was uncontested, however, that data underlying the

---

[22] Even if it were relevant, the agency's analysis of habitat effectiveness withers under the slightest of scrutiny. The cited paragraph of the SFEIS merely references a few HEIs from other projects, which the agency claimed as "representative" of the Project Area, but did not provide any supporting documentation for that assertion. Nor did the agency incorporate the analysis of the other project's HEI calculations by reference. *Cf. Guardians*, 790 F.3d at 925–28 (NEPA analysis deficient because agency failed to provide public with underlying data).

OBJ. TO F&R—34
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

maps predated the decision and were in the agency's possession during the administrative process. ECF52 at 4–6. LandWatch took every reasonable step to acquire the relevant data and submit the maps during the administrative process, but the agency did not release the data and blew every FOIA deadline; LandWatch finally was able to obtain the relevant data approximately one year after its initial request. ECF52 at 5. It was clear error to deny the motion to supplement based on an issue caused by the Forest Service's delay. *Cf. League v. Connaughton*, No. 3:12-cv-02271-HZ, 2014 U.S. Dist. LEXIS 170072, at *38–56 (D. Or. Dec. 9 2014) (faulting agency for failing to make information underlying environmental analysis available to public).

## CONCLUSION

For all of the foregoing reasons, and those stated in its summary judgment briefing, LandWatch asks this Court to modify the Findings and Recommendations on the Redband Trout and aquatic habitat and elk security habitat issues, and hold unlawful and set aside the Forest Service's SFEIS and ROD and remand for compliance with NEPA and NFMA.


DATED this 24th day of September, 2018.

Respectfully submitted,

s/ Oliver J. H. Stiefel
Oliver J. H. Stiefel, OSB # 135436
Tel: (503) 227-2212
oliver@crag.org
Christopher G. Winter, OSB # 984355
Tel: (503) 525-2725
chris@crag.org
Crag Law Center
917 SW Oak St., Suite 417
Portland, Oregon 97205
Fax: (503) 296-5454

*Attorneys for Plaintiff Central Oregon LandWath*

OBJ. TO F&R—35
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of September 2018, a true and accurate copy of Central

Oregon Landwatch's OBJECTIONS TO MAGISTRATE'S FINDINGS AND

RECOMMENDATIONS was filed electronically via the CM/ECF system by the United States

District Court, District of Oregon.

DATED this 24th day of September, 2018.


/s/ Oliver J. H. Stiefel
Oliver J. H. Stiefel
  Of Counsel for Plaintiff LandWatch

OBJ. TO F&R—I
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*917 SW Oak St. Suite 417*
*Portland, OR 97205*
*Tel. (503) 525-2722*