Oliver J. H. Stiefel, OSB # 135436
Tel: (503) 227-2212
oliver@crag.org
Christopher G. Winter, OSB # 984355
Tel: (503) 525-2725
chris@crag.org
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Fax: (503) 296-5454

*Attorneys for Plaintiff Central Oregon LandWatch*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| **CENTRAL OREGON LANDWATCH**, an Oregon non-profit corporation;<br><br>Plaintiff,<br><br>v.<br><br>**SHANE JEFFRIES**, in his official capacity as Ochoco National Forest Supervisor; **JAMES M. PEÑA**, in his official capacity as Regional Forester for Region 6 of the United States Forest Service; and the **UNITED STATES FOREST SERVICE**, a federal agency of the United States Department of Agriculture,<br><br>Defendants,<br><br>**OCHOCO TRAIL RIDERS**, **OREGON MOTORCYCLE RIDERS ASSOCIATION**; **PACIFIC NORTHWEST 4 WHEEL DRIVE ASSOCIATION**, **DESCHUTES COUNTY 4 WHEELERS**; and **THE BLUERIBBON COALITION**,<br><br>Defendants-Intervenors. | Case No. 2:17-cv-01004-SU (Lead)<br>*Case No. 2:17-cv-01091 (Trailing)*<br>Case No. 2:17-cv-01366 (Trailing)<br><br><br>**CENTRAL OREGON LANDWATCH'S RESPONSE TO OBJECTIONS OF FEDERAL DEFENDANTS AND DEFENDANTS-INTERVENORS** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

GLOSSARY OF TERMS .................................................................................................... vi

INTRODUCTION ................................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................................... 3

    I.   The OHV Project Increases Route Densities and Motorized Use Within Elk Habitat ............. 3

        A.   The Project Area provides calving, rutting, and security habitat,
             but despite management protections, the elk population is declining. ................... 3

        B.   The OHV Project would further reduce the amount of elk security habitat
             and increase motorized use during the calving and rutting seasons. ....................... 4

    II.   Endangered Wolves Are Known to be Dispersing Through the Project Area. ........................ 6

    III.   Judge Sullivan Correctly Resolved Claims Under NEPA, NFMA, and
         the ESA Related to Elk and Wolves. ............................................................... 8

LEGAL BACKGROUND AND STANDARD OF REVIEW ................................................. 9

ARGUMENT ...................................................................................................................... 9

    I.   The Forest Service Failed to Disclose and Consider the OHV Project's Impacts
      on Elk Habitat in a Manner Consistent With Its Duties Under NEPA and NFMA. ............... 9

        A.   The agency's presentation of the environmental baseline for elk special habitats
             was arbitrary and contrary to NEPA. ............................................................ 9

            1.   Future data collection and mitigation does not solve the problem of an
                inadequate baseline. ...................................................................... 9

            2.   To the extent that the agency relied on baseline "proxies," such analysis could
                not remedy the lack of baseline data. ............................................... 12

        B.   The agency has not demonstrated that the OHV Project is consistent with
             the Ochoco Forest Plan's requirement to protect elk special habitats ................... 14

            1.   Timing restrictions are meaningless if the agency does not know
                where they must apply. .................................................................. 14

            2.   The timing restrictions do not apply to OHV use of the trail system. ............... 17

         C.   The agency failed to take a hard look at impacts to elk security habitat. ................ 19

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

II.   The Forest Service Failed to Comply with the ESA With Respect to Gray Wolves. .............. 22

   A.   ESA Section 7 Consultation is required if a project "may affect" listed species. ................ 22

   B.   The agency's "no effect" determination was arbitrary and capricious. ................................. 24

     1.   Judge Sullivan correctly determined that the agency erroneously conflated
       its "may be present" and "no effect" determinations. ......................................................... 24

     2.   Flowers is neither controlling nor particularly helpful. ................................................. 26

     3.   The Forest Service must engage in Section 7 Consultation. ................................................. 28

  III.   Remedy ..................................................................................................................................... 31

CONCLUSION ........................................................................................................................................ 34

OBJ. TO F&R—ii
*LandWatch v. Forson, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

# TABLE OF AUTHORITIES

## CASES

*All. for the Wild Rockies v. Savage,*
  897 F.3d 1025 9th Cir. (2018) ................................................................... 15

*Ariz. Cattle Grower's Ass'n v. U.S. FWS,*
  273 F.3d 1229 (9th Cir. 2001) ................................................................... 2

*Ariz. Cattle Growers' Ass'n v. Salazar,*
  606 F.3d 1160 (9th Cir. 2009) ................................................................... 27

*Cal. Cmty's Against Toxics v. U.S. EPA,*
  688 F.3d 989 (9th Cir. 2012) ................................................................ 31, 34

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.,*
  575 F.3d 999 (9th Cir. 2009) ..................................................................... 23

*Ctr. for Biological Diversity v. U.S. BLM,*
  698 F.3d 1101 (9th Cir. 2012) .......................................................... 19, 26, 28

*Defenders of Wildlife v. Flowers,*
  414 F.3d 1066 (9th Cir. 2005) ................................................................... 26

*Defenders of Wildlife v. U.S. EPA,*
  420 F.3d 946 (9th Cir. 2005) ..................................................................... 27

*Fl. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1983) ................................................................................. 19

*Gifford Pinchot Task Force v. Perez,*
  No. 03:13-cv-00810-HZ, 2014 U.S. Dist. LEXIS 90631 (D. Or. July 3, 2014) ........... 11, 17

*Gifford Pinchot Task Force v. U.S. FWS,*
  378 F.3d 1059 (9th Cir. 2004) ................................................................... 13

*Hapner v. Tidwell,*
  621 F.3d 1239 (9th Cir. 2010) ................................................................... 17

*Idaho Farm Bureau Fed'n v. Babbitt,*
  58 F.3d 1392 (9th Cir. 2006) ..................................................................... 34

*Karuk Tribe v. U.S. Forest Service,*
  681 F.3d 1006 (9th Cir. 2012) .......................................................... 23, 29, 31

*Klamath-Siskiyou Wildlands Ctr. v. Grantham,*
  623 Fed. App'x 320 (9th Cir. 2015) ............................................................ 12

OBJ. TO F&R—iii
*LandWatch v. Forson, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

*Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008) .................................................................... 2, 16

*League v. Peña,*
  No. 3:12-cv-02271-HZ, 2015 U.S. Dist. LEXIS 46279 (D. Or. April 6, 2015) ................... 31, 32, 34

*League v. U.S. Forest Serv.,*
  No. 3:10-cv-01397-SI, 2012 U.S. Dist. LEXIS 190899 (D. Or. Dec. 10, 2012) .............................. 32

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,*
  668 F.3d 1067 (9th Cir. 2011) ........................................................ 9, 11, 12, 14

*Nat'l Parks & Conserv. Ass'n v. Babbitt,*
  241 F.3d 722 (9th Cir. 2001) ................................................................... 12

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
  524 F.3d 917 (9th Cir. 2005) ................................................................... 26

*Native Ecosystems Council v. Krueger,*
  946 F. Supp. 2d 1060 (D. Mont. 2013) ................................................... 25, 26, 28

*Native Ecosystems Council v. Tidwell,*
  599 F.3d 926 (9th Cir. 2010) ................................................................... 19

*Native Ecosystems Council v. U.S. Forest Serv.,*
  418 F.3d 953, 963 (9th Cir. 2005) ............................................... 14, 15, 17, 18, 22

*Native Ecosystems Council v. U.S. Forest Serv.,*
  428 F.3d 1233 (9th Cir. 2005) ................................................................. 22

*Neighbors of Cuddy Mtn. v. U.S. Forest Serv.,*
  137 F.3d 1372 (9th Cir. 1998) ................................................................. 15

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
  361 F.3d 1108 (9th Cir. 2004) ................................................................. 21

*Ohio Forestry Ass'n v. Sierra Club,*
  523 U.S. 726 (1998) ........................................................................... 16

*Or. Natural Des. Ass'n v. Jewell,*
  840 F.3d 562 (9th Cir. 2016) ................................................................. 16

*Or. Natural Des. Ass'n v. U.S. BLM,*
  625 F.3d 1092 (9th Cir. 2010) .............................................................. 2, 25

*Or. Natural Res. Council Fund v. Goodman,*
  505 F.3d 884 (9th Cir. 2007) ................................................................. 15

*S. Fork Band Council of W. Shoshone v. U.S. DOI,*
   588 F.3d 718 (9th Cir. 2009) ............................................................................... 17

*Se Alaska Conserv. Council v. U.S. Army Corps of Eng'rs,*
   486 F.3d 638 (9th Cir. 2007) ............................................................................... 31

*W. Oil & Gas Ass'n v. EPA,*
   633 F.2d 803 (9th Cir. 1980) ............................................................................... 34

*W. Watersheds Proj. v. Kraayenbrink,*
   632 F.3d 472 (9th Cir. 2011) ................................................................... 9, 27, 30

*WildEarth Guardians v. Mont. Snowmobile Ass'n,*
   790 F.3d 920 (9th Cir. 2015) ............................................................................... 13

## STATUTES

16 U.S.C. § 1531 ................................................................................................... 22

16 U.S.C. § 1536 ................................................................................................... 23

16 U.S.C. § 1604 ................................................................................................... 16

## REGULATIONS

50 C.F.R. § 402.02 .......................................................................................... 26, 30

50 C.F.R. § 402.12 ................................................................................................ 23

50 C.F.R. § 402.13 ................................................................................................ 30

50 C.F.R. § 402.14 ...................................................................................... 23, 24, 30

## OTHER AUTHORITIES

51 Fed. Reg. 19,949 (June 3, 1986) ..................................................................... 23

68 Fed. Reg. 15,804 (Apr. 1, 2003) ........................................................................ 6

76 Fed. Reg. 81,665 (Dec. 28, 2011) ...................................................................... 7

OBJ. TO F&R—v
*LandWatch v. Forson, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

## GLOSSARY OF TERMS

| | |
|---|---|
| Agency | United States Forest Service |
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| DEIS | Draft Environmental Impact Statement |
| CEQ | Council on Environmental Quality |
| CWA | Clean Water Act |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| Ex. | Exhibit |
| FEIS | Final Environmental Impact Statement |
| F&R | Findings and Recommendations |
| FWS | United States Fish and Wildlife Service |
| INFISH | Inland Native Fish Strategy |
| LandWatch | Central Oregon LandWatch |
| LWD | Large Woody Debris |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NMFS | National Marine Fisheries Service |
| m | Meters |
| mi | Miles |
| mi/mi$^2$ | Miles per Square Mile (a unit of measure used to calculate route density) |
| MIS | Management Indicator Species |
| ODFW | Oregon Department of Fish and Wildlife |
| OHV | Off-highway Vehicle |
| OHV Project | Ochoco Summit Trail System Project |
| ONF or Ochoco | Ochoco National Forest |
| RHCA | Riparian Habitat Conservation Area |
| RMO | Riparian Management Objective |
| ROD | Record of Decision |
| Route | Road or OHV Trail |
| SDEIS | Supplemental Draft Environmental Impact Statement |
| SFEIS | Supplemental Final Environmental Impact Statement |
| SUPP | Supplemental Administrative Record |
| t. | Table |

OBJ. TO F&R—vi
*LandWatch v. Forson, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(2), Central

Oregon LandWatch ("LandWatch") hereby submits its Response to the Objections to the Findings

and Recommendations ("F&R") filed by Federal Defendants ("FD Obj.") and Defendants-

Intervenors ("DI Obj."), ECF94, 95.[1]

## INTRODUCTION

The proposed 137-mile OHV trail network in the heart of the Ochoco National Forest in

Central Oregon ("Ochoco") would be a permanent source of habitat degradation for fish and

wildlife, and would displace recreational users of the forest including hunters, fishermen, hikers, and

wildlife photographers. A diverse group of interests challenged the approval of the OHV Project

and the underlying analysis on account of the significant impacts of OHV routes on fish and wildlife

habitat. As explained in LandWatch's Objections, ECF96, Judge Sullivan correctly recommended

vacatur of the U.S. Forest Service's ("Forest Service" or "agency") Record of Decision ("ROD")

and Supplemental Final Environmental Impact Statement ("SFEIS") based on fatal defects related

to Rocky Mountain elk ("elk") and Gray wolves ("wolves"). ECF89.[2]

Defendants have filed Objections to the F&R based on fundamental misconceptions of the

record and the governing legal requirements of NEPA, NFMA, and the ESA. LandWatch addresses

the specific points related to elk and wolves more fully below, but at the outset, provides a brief

rebuttal to Defendants' three principal thematic arguments.

Defendants first broadly suggest that Judge Sullivan overstepped the bounds of judicial

review, casting the decision to approve the OHV Project as a mere policy choice. Before the agency

could exercise its discretion as to which uses to permit on the Ochoco, it had a duty to first ensure

that the OHV Project would comply with NEPA, NFMA, and the ESA. Judge Sullivan correctly

---

[1] Citations to the docket and record follow the same format as ECF96.
[2] LandWatch has filed a narrow set of Objections to the F&R's with respect to the OHV Project's significant impacts on aquatic habitat and Redband trout. ECF96.

RESP. TO OBJ. TO F&R—1
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

focused not on the agency's ultimate policy choice, but rather, on the failure to take a careful and searching hard look at the OHV Project's impacts as required by federal law. Judge Sullivan's F&R is fully consistent with the proper role of the federal courts to enforce that law.

Second, Defendants argue that Judge Sullivan failed to appreciate the "extensive and robust" environmental analysis. Although voluminous in pages, the agency's analysis cannot survive arbitrary and capricious review. Instead of collecting key data on baseline conditions, the agency pledged to conduct mitigation and monitoring during implementation of the project. But this act-first, look-later approach unlawfully locked the public out of the environmental review and decisionmaking process. And while the agency pointed to its some-day intentions to close and rehabilitate an unspecified number of unauthorized OHV routes (contingent on uncertain funding sources), this vague promise is no substitute for the detailed, up-front disclosure of a project and its impacts that is required by federal law.

Third, Defendants fault Judge Sullivan for failing to grant the Forest Service experts "proper deference." No deference is due, however, to an agency's "conclusions that do not have a basis in fact," *Ariz. Cattle Grower's Ass'n v. U.S. FWS*, 273 F.3d 1229, 1236 (9th Cir. 2001), or where the agency fails to support its findings with reliable information. *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008). Here, the Forest Service tried to minimize significant impacts by simply hypothesizing—without providing supporting evidence—that the new trail system would mitigate impacts from unauthorized OHV use. The evidence in the record suggests that just the opposite is true: unauthorized OHV use increases with additional motorized users.

The fact is that OHVs "profoundly change the lands across which they travel." *Or. Natural Des. Ass'n v. U.S. BLM*, 625 F.3d 1092, 1123 (9th Cir. 2010). Judge Sullivan correctly determined that the Forest Service failed to adequately discharge its procedural and substantive duties before authorizing this habitat-degrading project that would occupy nearly half of the Ochoco.

RESP. TO OBJ. TO F&R—2
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

## FACTUAL AND PROCEDURAL BACKGROUND

LandWatch respectfully refers this Court to the Factual and Procedural Background section of its Objections, ECF96. LandWatch supplements that background below with additional details relevant to this Response.

**I.     The OHV Project Increases Route Densities and Motorized Use Within Elk Habitat.**

**A.     The Project Area provides calving, rutting, and security habitat, but despite management protections, the elk population is declining.**

The Project Area contains important habitats for elk, including calving areas, AR24341, and rutting sites (or "wallows"), which are low-disturbance areas used by bull elk during the fall rutting (breeding) season. AR26928. As LandWatch's expert Mike Gerdes explained, "[e]lk calving and wallow habitat are important to ensure the reproductive viability of the local elk populations." AR26928. Mr. Gerdes is a wildlife biologist with over 34 years of experience, including 25 with the Forest Service. AR26927.

The Ochoco Forest Plan provides binding Standards and Guidelines for these special habitats, with protections restricting disturbance activities during the calving and rutting seasons. AR1670; *see also* 1621 (requiring the agency to minimize the effects of management activities on elk wallows). Standards and Guidelines also require the agency to provide sufficient cover and concealment habitat, sufficient forage, and low-road densities. AR1670.

The Forest Plan's protections are critical because wallows and calving sites are uniquely susceptible to disturbance activities. *See* AR1621 (wallows are "[f]ragile areas * * * which exhibit sensitivities that require special care"); AR26928 (calving areas free from disturbance are critical to successful breeding); SUPP20119 ("If elk are left inadequate calving-season habitat and can no longer escape disturbance * * * then population levels may decline.").

Despite these protections, the elk population is declining. The overall goal set by the Ochoco Forest Plan is to meet ODFW's elk population management objectives. AR1459. The

RESP. TO OBJ. TO F&R—3
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

current population management objective for the Ochoco management unit is 4,600 elk, but this

objective has not been met since 2006. AR25511. ODFW has documented a trend in recent years of

elk moving off the Ochoco to private lands to avoid high road densities and motorized use.

AR15233. Displacement onto private lands can result in a need to cull the population to prevent

agricultural damage. AR26743; AR26934. There appears to be a correlation between this

displacement and the shrinking amount of elk "security habitat" on the Ochoco.

To provide protection from predators and human disturbance, elk seek areas of security

habitat during periods of calving, rutting, and other life cycle functions. AR26929–30. Studies

emphasize the importance of maintaining at least 30% of an analysis area as security habitat.

AR26753. The Forest Service concluded that only 16% of the Ochoco Project Area comprises

security habitat. *See* AR25520 (47,969÷301,580). As described in LandWatch's Objections, the actual

amount of security habitat likely is significantly lower because the agency did not account for

existing habitat conditions or the effects of continued land management activities. *See* ECF96 at 15–

16, 39–41; *see also* AR26931–34 (explaining that although the agency disclosed that there are

currently 3,745 acres of security habitat in the Deep Creek watershed, the agency did not account for

the Deep Vegetation Management Project, which has or will impact 25,167 acres or 46% of the

watershed). In fact, the Forest Service admits that "relatively small percentages of the project area"

comprise elk security habitat, AR25532, and that the SFEIS likely "overestimated" the actual

amount of security habitat across the Project Area. AR28119.

### B.    The OHV Project would further reduce the amount of elk security habitat and increase motorized use during the calving and rutting seasons.

The construction and motorized use of OHV routes poses significant risks to elk because

OHV routes fragment elk habitat and displace elk during important behavioral cycles. *See* AR25467

(negative effects of OHV use on wildlife include mortality, direct and indirect loss of habitat,

displacement, reduced connectivity, and decreased reproductive success); *see also* SUPP429 "[O]ff-

RESP. TO OBJ. TO F&R—4
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

road recreational activities * * * have a substantial effect on elk behavior."); AR5709 ("Survival rates of elk are reduced in areas with higher road density."). On account of the wide body of scientific literature and empirical data on OHV impacts, ODFW warned that the "disturbance associated with this project will impact calving * * * time periods as well as critical summering habitat," AR20853, with the potential for "population wide effects." AR26743. The Forest Service does not dispute the potential negative impacts that OHV use may have on elk and elk habitat.

The proposed OHV trail system would be open to motorized use from June 1 through September 30 each year, AR28736, and thus would overlap with the critical calving (May 15 to June 30) and fall rutting (September 1 to October 15) seasons by 30 days of the approximately 45 days available to elk during each period. The OHV Project includes timing restrictions on **construction activities** within "known" elk calving habitat and wallows during the calving and rutting seasons. AR28759–60. But the agency did not collect any data on any "known" calving habitat or wallows; the agency simply does not have any current information on where elk are using the Project Area for these critical life cycle functions. After the close of the NEPA process, the agency pledged to monitor for these habitats, but did not identify a specific plan, enforceable mitigation measures, or dedicated funding sources. *See* AR28782–83 (ROD, identifying "determine a wildlife effects monitoring plan" and "apply for grant funding for wildlife monitoring" as future action items).

The OHV Project does not include any timing restrictions on **motorized use** of the OHV trails, meaning that OHVs would be permitted to traverse calving sites and wallows for 30 days of each of the 45-day calving and rutting seasons. The Forest Service never explained how a disturbance-free window of only 15 days during these seasons would be sufficient for elk to carry out successful calving and mating. AS ODFW observed, allowing motorized routes during the calving window would not avoid disturbance to elk and their newly born calves. AR26743.

RESP. TO OBJ. TO F&R—5
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

The OHV Project, by constructing or opening 137 miles of OHV routes, would reduce security habitat in the Project Area by more than 5,000 acres. AR25520. Nevertheless, the agency determined that elk population numbers would not be negatively affected, AR25778, because 42,431 acres of security habitat would remain after implementation. AR25520. Although it acknowledged that elk populations are limited by habitat capability, including security habitat, and that such habitat changes over time in response to open road density, AR1459, the agency accounted only for "administratively open" roads in its analysis. In the Project Area, numerous closed roads and user-created trails—*i.e.*, routes that are not "administratively open"—are receiving motorized use. *See* AR25532; AR26950 (picture of "administratively closed" road that is clearly open to motorized use). A wide body of literature demonstrates the need to factor all "functionally open" roads into the analysis of impacts to elk habitat. *See, e.g.*, AR5710 (elk mortality was positively correlated to densities of both closed and open roads). As Judge Sullivan observed, "[p]resumably, elk are unable to distinguish between user-created and Forest-Service-created motorized routes[.]" ECF89 at 24.

## II.    Endangered Wolves Are Known to be Dispersing Through the Project Area.

Gray wolves (*Canis lupus*) are a species of carnivore native to Oregon. *See* AR28540. Wolves occurring in the Project Area are listed as "Endangered" under the ESA. *See* ECF23, 27 ¶ 104; AR28524. Wolves primarily prey on medium and large mammals, including deer, caribou, moose, and elk. ECF23, 27 ¶ 104; 68 Fed. Reg. 15,803, 15,804 (Apr. 1, 2003). Elk are a particularly important prey species; research conducted in Oregon showed elk remains at over 60% at wolf prey acquisition sites. AR28533–34; *see also* AR28591("elk are typically the primary prey of wolves").

Wolves are social animals, normally living in packs of two to twelve animals. ECF23, 27 ¶ 104; *see also* 68 Fed. Reg. at 15,805. Yearling wolves frequently disperse from their natal packs, possibly becoming nomadic or claiming suitable unoccupied habitat with a member of the opposite sex to begin their own territorial pack. *Id.* According to the U.S. Fish and Wildlife Service ("FWS"),

RESP. TO OBJ. TO F&R—6
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

"[t]he dispersal of wolves from their natal packs and territories is a normal and important behavioral attribute of the species that facilitates the formation of new packs, the occupancy of vacant territories, and the expansion of occupied range by the 'colonization' of vacant habitat." 76 Fed. Reg. 81,665, 81,673 (Dec. 28, 2011). ODFW views the ability of wolves to disperse from their natal territory as critical to the success of wolf management in Oregon. AR28547.

Dispersal/transient habitat is present in the Project Area. AR25477. Important predictors of wolf habitat include (1) forested areas, (2) public ownership; and (3) prey availability. AR28559; AR26744. In 2015, ODFW mapped potential habitat in Oregon for wolves based on the habitat predictors, revealing that much of the Project Area comprises suitable wolf habitat. AR28677–78. In fact, wolves are increasingly using the Ochoco and Project Area. A Forest Service biologist in December 2016 remarked that "[w]e have had numerous collared wolves within the last two years in and around the Forest * * *. In addition, our number of unconfirmed public sighting reports have increased over that time as well * * *."). AR27937. These reports are corroborated by ODFW's map of radio-collared wolf activity, showing activity in the Ochoco and the Project Area. AR23788; *see also* AR27930. The record evidence demonstrates that the Ochoco and Project Area is becoming an important connective corridor between occupied habitat in the Blue Mountains of Northeast Oregon and the Southern Oregon Cascades. AR26941.

Despite acknowledging suitable wolf habitat in the Project Area and verifiable wolf sightings in recent years, the Forest Service determined that the OHV Project would have "no effect" on wolves. AR25479. According to ODFW and the best available science, however, the OHV Project threatens to impact wolves in two ways. AR26743. For one, the OHV Project would affect the distribution and population of elk, the wolf's primary prey. According to ODFW, elk avoid areas open to motorized vehicles, and avoidance is stronger as motorized use increases. *Id.* The OHV Project would increase both open route densities and traffic rates, which would cause shifts in

RESP. TO OBJ. TO F&R—7
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

distribution, increase vulnerability to harvest, and increase stress levels and energetic costs—

ultimately threatening population-level impacts to elk. AR26743–44.

Second, the OHV Project would negatively influence suitable wolf habitat. Wolf persistence

is strongly correlated with public ownership; by shifting prey to private lands, wolves are less likely

to persist due to increased human conflicts. AR27644; AR26942 (wolves will follow their prey down

to private lands). Moreover, areas of suitable wolf habitat are associated with low road densities and

human presence; by increasing route densities and human use, the OHV Project would decrease the

habitat suitability. *Id.*

## III.    Judge Sullivan Correctly Resolved Claims Under NEPA, NFMA, and the ESA Related to Elk and Wolves.

Defendants object to Judge Sullivan's resolution of five principal issues in favor of

LandWatch, as described in LandWatch's Objections at page 11, ECF96. To summarize:

- First, Defendants object to the determination that the Forest Service acted arbitrarily and contrary to NEPA where it failed to provide current baseline data on elk special habitats— wallows and calving areas. FD Obj. at 20–22.

- Second, Defendants object to the determination that the Forest Service failed to demonstrate consistency with the Ochoco Forest Plan's protections for wallows and calving areas. FD Obj. at 10–13; DI Obj. at 6–10.

- Third, Defendants object to the determination that the Forest Service violated NEPA by failing to take a hard look at the direct, indirect, and cumulative impacts to elk security habitat vis-à-vis the impacts of all routes receiving motorized use. FD Obj. at 19–20, 22–23.

- Fourth, Defendants object to the determination that the Forest Service's "no effect" conclusion for Endangered Gray wolves and failure to engage in Section 7 consultation was arbitrary and contrary to the ESA. FD Obj. at 4–8; DI Obj. at 5–6.

- Fifth, Defendants object to the proposed remedy of vacatur of the OHV Project decision. FD Obj. at 29–32.

LandWatch responds to Defendants' objections below. Judge Sullivan's F&R on the elk and

wolf issues was based on a careful examination of the record, comports with Circuit precedent, and

should be upheld by this Court.

RESP. TO OBJ. TO F&R—8
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

## LEGAL BACKGROUND AND STANDARD OF REVIEW

LandWatch respectfully refers the Court to the Legal Background and Standard of Review

sections of its Objections at pages 19–22, ECF96, for background on NEPA and NFMA.

Legal background on the ESA is provided below in the Argument section II.A. This Court

reviews the ESA claim pursuant to the APA's arbitrary and capricious standard of review. *W.*

*Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). An agency's "no effect"

determination and failure to consult under Section 7 of the ESA is arbitrary and capricious where

the agency "fail[s] to consider relevant expert analysis or articulate a rational connection between the

facts found and the choice made." *Id.* at 498.

## ARGUMENT

I.    **The Forest Service Failed to Disclose and Consider the OHV Project's Impacts on Elk Habitat in a Manner Consistent With Its Duties Under NEPA and NFMA.**

A.    **The agency's presentation of the environmental baseline for elk special habitats was arbitrary and contrary to NEPA.**

There is no information in the SFEIS and project record about the current location and

distribution of elk wallows and calving areas in the Project Area. Despite repeated requests from the

public and ODFW to collect baseline information on these special habitats **prior to** approval of the

OHV Project, the agency moved forward and simply pledged to conduct monitoring during project

implementation. As Judge Sullivan correctly determined, however, the "Forest Service cannot rely

on future monitoring of calving sites and wallows, because data must be available during the EIS

process and be available for public comment." ECF89 at 30 (citing *N. Plains Res. Council, Inc. v.*

*Surface Transp. Bd.*, 668 F.3d 1067, 1084–85 (9th Cir. 2011)).

1.    **Future data collection and mitigation does not solve the problem of an inadequate baseline.**

Rather than collecting critical baseline data on elk wallows and calving areas during the

NEPA process—thereby facilitating informed public comment and decisionmaking—the agency

RESP. TO OBJ. TO F&R—9
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

decided to approve the OHV Project and then collect the relevant baseline information later. *See* AR28760; AR28688–90 (post-NEPA meeting to discuss "collecting baseline data on elk use in the project area"). This "act first, look later" approach stands directly at odds with Circuit precedent.

The agency admits that elk wallows exist in the Project Area. ECF23, 27 ¶ 127. Despite the fact that successful rutting is "essential to the health, productivity, and vitality of an elk herd," AR26928, the agency did not survey for or collect any information on the location of elk wallows before approving the OHV Project. In other words, the agency provided zero baseline data on elk rutting habitat.

Regarding elk calving habitat, the agency's baseline data is more than 25 years old. The agency claimed to have located trails away from "[a]reas with high concentrations of elk during the calving period based on telemetry data collected by [ODFW]." AR25529. This telemetry data was collected between 1989 and 1994. *Id.* The agency made no attempt to explain why this data remains reliable. Since 1994, there have been dozens of habitat-disturbing activities in the Project Area, *see* AR25277–79 (t. 7) (listing vegetation management and other projects), and these types of projects are known to impact elk special habitats. *See* AR26928 (disturbance by humans during calving season decreases reproductive success). For example, the Deep Vegetation Management project, which overlaps the Project Area, was approved in 2001. Although calves were sighted during pre-project surveys, the project implemented 25,176 acres of logging and prescribed burning in the calving habitat. AR26932. No surveys have been undertaken to see whether calving habitat still exists.

After the close of the NEPA process, in response to public opposition over the reliance on stale data and lack of an adequate baseline, *e.g.*, AR26811, AR27966, AR28689, the Forest Service pledged to conduct future monitoring and mitigation. The agency admitted to a "lack of data," AR27962, and acknowledged that "[e]lk calving sites are a particular concern." AR27961. Accordingly, the agency stated that new telemetry data would help facilitate project implementation,

RESP. TO OBJ. TO F&R—10
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

*id.*, and pledged to tweak project implementation if monitoring "indicates that potential habitat is actually being used as calving habitat[.]" AR28759. The agency also proposed mitigation measures "should any elk wallows be identified along the trail system[.]" AR28760.

NEPA, however, requires a determination of "the projected extent of the environmental harm to enumerated resources **before** a project is approved[.]" *N. Plains*, 668 F.3d at 1084. Mitigation and monitoring measures "may help alleviate impact **after** construction, but do not help to evaluate and understand the impact before construction." *Id.*; *see also Gifford Pinchot Task Force v. Perez*, No. 03:13-cv-00810-HZ, 2014 U.S. Dist. LEXIS 90631, at *78–79 (D. Or. July 3, 2014) ("Ninth Circuit cases acknowledge the importance of obtaining baseline condition information before assessing the environmental impacts of a proposed project.").

In *Northern Plains*, the agency proposed that surveys of sensitive plants and wildlife would be conducted after project approval, and that mitigation efforts would be implemented to minimize the impact of the project. 668 F.3d at 1084. The Circuit Court pointed out that a deferred analysis of environmental impacts is inconsistent with the core purposes of NEPA. Without baseline data, the agency "cannot carefully consider information about significant environmental impacts," and even if data is to be collected at some time in the future, "the data is not available during the EIS process and is not available to the public for comment." *Id.* at 1085.

Defendants in their Objections assert an "impracticability" defense—because calving sites and wallows allegedly move from year to year, it is impractical to collect baseline data because the special habitats may change. There does not appear to be any record support for this position; indeed, the only support Defendants can muster is a citation to the oral argument transcript in which their counsel argues—without citation—that calving and rutting sites are fluid. *See* FD Obj. at 12 (citing ECF96-1 at 46, 106–07). Elsewhere in the argument, however, counsel argued that elk exhibit fidelity to the same types of geographic features, undercutting the position that calving and

RESP. TO OBJ. TO F&R—11
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

rutting sites necessarily change annually. ECF96-1 at 107. Either way, agency counsel's *post-hoc* litigation position that is untethered to any record support does not provide a factual basis for the "impracticability" defense.[3]

As a legal matter, the Ninth Circuit has already rejected this line of argument. In *Northern Plains*, the agency complained that it was unable to conduct studies for baseline data due to rough terrain and the difficulty of obtaining landowner consent. The Circuit Court stated: "We are unpersuaded that these excuses can relieve the [agency] of its requirement under NEPA to gather information before it can make an informed decision. 668 F.3d at 1086; *see also Klamath-Siskiyou Wildlands Ctr. v. Grantham*, 623 Fed. App'x 320, 321 (9th Cir. 2015) (purpose of the NEPA analysis is to "develop evidence" to determine the impacts of a project). As Judge Sullivan aptly pointed out, "it is difficult to determine how the proposed agency action here will have an effect on elk calving and rutting areas if defendants have not adequately identified those areas." ECF89 at 31.

Judge Sullivan's F&R on this issue is entirely consistent with Circuit precedent and should be upheld. By deferring the gathering of baseline data, the agency was unable to take a hard look at the OHV Project's impacts, in violation of NEPA.

### 2.    To the extent that the agency relied on baseline "proxies," such analysis could not remedy the lack of baseline data.

Defendants attempt to distract from the agency's actual approach here—pledging to collect future data and implement mitigation measures—and contend that the NEPA analysis was valid because the agency appropriately relied on "proxies" for actual calving habitat and wallows. Neither the record nor the law supports this position.

---

[3] The practical consequences of the "impracticability" defense further undermine the credibility of this argument. If the agency could simply plan and implement habitat-disturbing projects, **and then** collect data on the location of special habitats, such habitat could be degraded before it is located and sufficiently protected. As the Ninth Circuit has observed, this approach has it "exactly backwards." *Nat'l Parks & Conserv. Ass'n v. Babbitt*, 241 F.3d 722, 733 (9th Cir. 2001).

RESP. TO OBJ. TO F&R—12
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

Defendants assert that the agency used a "proxy" approach for analyzing wallows, but fail to provide any record support for this assertion. FD Obj. at 22 (citing AR25619). The cited section of the SFEIS regarding impacts to meadows is completely distinct from the sections on impacts to elk habitat; the public had no way to know that the agency apparently was assessing elk wallows in the section on meadows where neither the terms "wallows" or "rutting" was referenced in that section of the SFEIS. *Cf. WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 926–28 (9th Cir. 2015) (rejecting agency's argument that other sections of the EIS provided sufficient information on big game winter range where the agency never explained it was employing a proxy approach). Plainly, the agency did not collect any baseline data on elk wallows—through habitat proxies or otherwise.[4]

Defendants also cite to a supposed habitat proxy used for elk calving habitat, but it is not clear from the record that the agency was using "potential elk calving habitat" as a substitute for actual baseline data. As the Ninth Circuit has made clear, a habitat proxy must "mirror reality." *Gifford Pinchot Task Force v. U.S. FWS*, 378 F.3d 1059, 1066 (9th Cir. 2004). Here, the agency admitted that the "potential" elk calving areas "are not necessarily areas of use." AR25826.

The admitted disconnect between "potential" calving habitat and actual calving locations, formed the basis for the post-decisional monitoring and mitigation measures. After the close of the NEPA process, the agency stated its intention to have a "dialogue" on how to gather actual data on elk calving sites. AR27962. As the Forest Supervisor stated:

---

[4] A closer review of the cited section of the SFEIS reveals how absurd the Defendants' position is. Defendants claim that only .02 percent of the "meadow" habitat would be impacted by the OHV Project (1.42 acres). FD Obj. at 22. But in the analysis of impacts to meadows, the Forest Service only accounted for a 10-foot zone of influence. AR25619. Defendants' position therefore is that rutting bull elk would not be impacted by OHVs zipping by at a distance of 11 feet away. In the elk section of the SFEIS, however, the agency stated that areas within **660 feet** of an open route represent a "high-disturbance zone," and areas within a ½ mile of an open route do not provide "security" habitat. AR25519. This absurdity demonstrates why the Forest Service cannot assert this "proxy" after-the-fact, because it deprives the public of an opportunity to provide comment on that questionable assumption while also depriving this Court of the opportunity to review the agency's response to public comments.

RESP. TO OBJ. TO F&R—13
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

Elk calving sites are a particular concern. I would like to work in partnership with ODFW, and perhaps hunting partners represented here with OHA and RMEF **to conduct current telemetry of elk**. * * * Telemetry data for elk calving would help us make decisions for prioritizing investments to manage access and decommission unauthorized routes.

AR27961 (emphasis added).

On a very similar fact pattern, the Ninth Circuit rejected the reliance on "potential" sage grouse habitat, which the agency pledged to update with post-decisional monitoring and mitigation. 668 F.3d 1084–85. Here, Defendants fail to show how the reliance on "potential" elk calving habitat satisfied the agency's duties under NEPA where the agency itself has disavowed any reliance on "potential" calving areas, and admitted that data on actual locations needs to be collected. Baseline data, however, must be gathered and evaluated "before the project is approved, not afterward." *Id.* at 1083. Judge Sullivan correctly determined that the agency acted arbitrarily and contrary to NEPA by failing to properly analyze baseline conditions of elk special habitats in the Project Area.

**B.    The agency has not demonstrated that the OHV Project is consistent with the Ochoco Forest Plan's requirement to protect elk special habitats.**

Forest-wide Standards and Guidelines require the agency to "Protect the character of elk calving sites. Minimize disturbance from human activity during the calving season (approximately May 15 to June 30)." AR1670. The Forest Plan similarly requires the agency to "Protect wallows during rutting season (September 1 to October 15)." *Id.* As Judge Sullivan correctly determined, the Forest Service's conclusion that it is in compliance with these Standards and Guidelines is unsupported by the record. *See* ECF89 at 19–22; *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 963 (9th Cir. 2005) (reviewing court must be able "reasonably to ascertain from the record that the Forest Service is in compliance with [a Forest] Plan standard.").

**1.    Timing restrictions are meaningless if the agency does not know where they must apply.**

The ROD places timing restrictions on "project construction, re-construction,

RESP. TO OBJ. TO F&R—14
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

decommissioning, and maintenance activities from May 15 through June 30 within **known** elk calving areas[.]" AR28759. These same restrictions apply between September 1 and October 15 within **known** elk wallows. AR28760. As described above however, the agency does not have any baseline data on the location of wallows or calving areas. Thus, despite admitting that these special habitats are present in the Project Area, the timing restrictions do not apply to any wallows or calving areas because the agency does not know where they are located. As Judge Sullivan correctly determined, "the restrictions are insufficient to protect the sites as required by the Forest Plan [because the] restrictions apply only to **known** sites." ECF89 at 20.

Defendants take umbrage with this straightforward determination, faulting Judge Sullivan for failing to accord deference to the agency's "scientific judgment." FD Obj. at 12. But this is not a scientific issue; it is a practical one. As Judge Sullivan observed, "[t]he problem is that, without data identifying the location of calving sites and wallows, the Forest Service cannot meet its obligation to protect those sites or minimize disturbance to them." ECF89 at 21. In sum, how can the agency meet its Forest Plan obligation to protect and minimize impacts to elk calving sites and wallows if it does not know where those special habitats are located?[5]

Judge Sullivan's F&R on this issue comports with Ninth Circuit case law, which emphasizes the need to gather baseline information to provide an analytical foundation for demonstrating forest plan consistency. *See All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1035–37 (9th Cir. 2018) (failure to provide calculation of baseline road densities); *Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 894–95 (9th Cir. 2007) (failure to designate certain lands as "Riparian Reserves" prior to project implementation); *Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1377–78 (9th Cir. 1998)

---

[5] Notably, the Ochoco Forest Plan's Standards and Guidelines apply to wallows and calving sites, period. The Forest Plan never says that protections apply only to "known" wallows and calving sites—that is simply an additional requirement grafted onto this site-specific project. But the agency may not attempt to amend the Forest Plan's requirements in this manner—it must engage in an amendment process complying with NEPA and NFMA. *See Native Ecosystems*, 418 F.3d 961.

RESP. TO OBJ. TO F&R—15
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

(failure to provide information on woodpecker home ranges). As the Circuit Court has made clear, the collection of baseline data is a "practical requirement" underlying any environmental analysis. *Or. Natural Des. Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016).[6]

Here, the necessity of data on the location of wallows and calving areas is evident from the plain terms of the seasonal restrictions, which apply only to **known** wallows and calving areas. AR28759–60. Because the agency lacks any such data, it pledged to undertake future monitoring and mitigation measures. *See* AR28117 ("if monitoring indicates that potential habitat is actually being used as calving habitat, a seasonal restriction would be placed on the affected trail segments"). Mitigation measures, however, "are not a panacea for inadequate data collection and analysis." *Jewell*, 840 F.3d at 571–72. It is well settled that the duty to ensure forest plan consistency attaches at the time of the decision—not at some speculative future date. ECF89 at 21 (citing *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729–30 (1998)); 16 U.S.C. § 1604(i).

As a practical matter, the mere mention of future monitoring is meaningless without some discussion of how, when, and where the monitoring would take place, and its likely effectiveness. As ODFW pointed out, the agency "needs to have a rigorous plan to collect baseline data several years before the project should start." AR27966. Here, there is no plan to conduct pre-implementation monitoring, and the agency merely pledges to extend seasonal restrictions to "newly identified" wallows and calving sites during implementation of the project. AR28759–60. The agency does not explain how it is practical or even possible to identify these special habitats—which are highly sensitive to human disturbance—**during** construction. In other words, it is entirely unclear how the

---

[6] Defendants confuse the issue by arguing that the agency need not support its conclusions with on-the-ground surveys. FD Obj. at 11 (citing *McNair*, 537 F.3d at 991). This is not an instance where the agency is purporting to sustain the species' viability by protecting a certain amount of habitat as a "proxy." *See McNair*, 537 F.3d at 996–99. Here, the agency has made clear that the timing restrictions apply only to "known" sites, not potential sites. AR28759–60. Thus, because the agency has no information on the location of elk wallows or calving areas, the agency is not protecting any habitat at all—despite the Ochoco Forest Plan's clear requirement to do so.

RESP. TO OBJ. TO F&R—16
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

agency could meet its duty to "protect" elk special habitats by collecting data on the location of

those habitats during implementation—when the effects of the OHV Project are already occurring.

*Cf. Gifford Pinchot*, No. 03:13-cv-00810-HZ, 2014 U.S. Dist. LEXIS 90631, at *108 (explaining that a

"discussion of mitigation measures' effectiveness is an essential component of a reasonably

complete mitigation discussion") (citing *S. Fork Band Council of W. Shoshone v. U.S. DOI*, 588 F.3d

718, 727 (9th Cir. 2009)).[7]

As Judge Sullivan correctly determined, the agency's "provisions for future monitoring and

mitigation of disturbance to these sites, *see* AR28782–83, which have not been prepared or funded,

are not sufficient to meet Forest Plan requirements." ECF89 at 21. Because the agency has failed to

rationally explain how the OHV Project is consistent with the Ochoco Forest Plan, the approval of

the OHV Project is arbitrary and contrary to NFMA. *See Native Ecosystems*, 418 F.3d at 961–64.

### 2.    The timing restrictions do not apply to OHV use of the trail system.

The plain language of the Ochoco Forest Plan requires the agency to "protect the character"

of elk calving and rutting sites by "minimiz[ing] disturbance from human activity" during the calving

and rutting seasons. AR1670. Although the Forest Plan seasonal restrictions run from May 15 to

June 30 for the elk calving season, and from September 1 to October 15 during the rutting season,

the "season of use for motorized vehicles on the designated trail system will be from June 1 to

---

[7] Defendants broadly suggest that the agency satisfied its Forest Plan duties at the outset of
the OHV Project by allegedly routing trails away from wallows and calving areas. FD Obj. at 10–11.
But the argument rings particularly hollow on this record, where the agency did not identify **any**
wallows, and its data on elk calving sites was **25 years old**. While Defendants claim that the siting of
trails was conducted "through coordination with ODFW," *id.*, they fail to mention that ODFW
expressed that the Forest Service had "not alleviated" ODFW's concerns, and therefore "strongly
recommend[ed] Alternative 1, the No Action Alternative be selected." AR15527, 15238.

In a similar vein, Intervenors' observations about elk population numbers are at once
misleading and irrelevant to the question of Forest Plan compliance. DI Obj. at 9–10. For one, the
elk population is declining, and below management objectives. But even if it were the case that the
elk population met or exceeded population objectives, that does not relieve the agency of the duty to
demonstrate consistency with the Standards and Guidelines of the Ochoco Forest Plan. *Hapner v.
Tidwell*, 621 F.3d 1239, 1251 (9th Cir. 2010).

September 30." AR28736. The season of use thus conflicts with the Forest Plan timing restrictions by 30 of 45 days for both the elk calving and rutting seasons. *See Native Ecosystems*, 418 F.3d at 961 ("It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA.").

There is no dispute that motorized **use** of OHV trails disturbs elk. *See* AR26927 (the noise of motor vehicles is a disturbance that affects the functional quality of habitat). Elk are particularly vulnerable during reproductive and breeding periods. AR26928. One study showed that during the calving season, only 10 human-disturbance periods above ambient noise levels yielded no recruitment. SUPP20112. Displacement of elk from high quality birthing sites to less functional sites is likely to result in reduced productivity of the population. AR26965.

Nevertheless, the OHV Project contains no provision restricting OHV use within or near elk calving sites or wallows during the calving and rutting seasons. LandWatch, ODFW, and others specifically and repeatedly brought this deficiency to the agency's attention during the administrative process. *See* AR24203; AR26965; AR26743. In response, the agency merely reiterated that seasonal restrictions would apply to "trail construction and maintenance activities," AR25805—thereby skirting the issue of motorized **use** of the OHV trails.

In their summary judgment briefing and at oral argument, Defendants tried to plug this glaring hole in the record by arguing that "the timing restrictions were meant to apply to motorized OHV use during the relevant calving and rutting seasons." ECF89 at 20. As Judge Sullivan found, however, "the record does not reflect the defendants' claim." *Id.* The ROD did not "expand[] these seasonal protections to include protections from trail use for known elk calving sites and wallows." ECF89 at 30. By its plain terms, the ROD's language "regarding seasonal protections on these sites encompasses only trail construction and maintenance activities, not use." *Id.*

RESP. TO OBJ. TO F&R—18
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

Defendants ask this Court to reject Judge Sullivan's straightforward analysis of the ROD's plain language and accept their *post-hoc* litigating position. But the attempt to infer from the ROD an unspoken intention to extend seasonal restrictions to OHV use simply cannot be reconciled with the ROD's plain language or the underlying record. The agency had every opportunity during the administrative process to reconcile the issue of OHV use in and around elk wallows and calving areas, but never squarely addressed it. *Compare* AR24203 (LandWatch's comment that the agency's Project Design Criteria ("PDC") failed to protect elk wallows from use from September 1–30) *with* AR25805 (agency's Response to Comments, faulting commenters for failing to "provide rationale to support the opinion that PDC's are insufficient"). Agency counsel's re-write of the ROD only serves to underscore that it is not clear from the record that the agency has complied with the Forest Plan provisions, a NFMA violation, as Judge Sullivan found.

Defendants' fallback—an unsupported theory of "estoppel"—appears to be a concession of liability. But for purposes of relief, it does not matter whether agency counsel is on record as to the scope of the seasonal protections. "Defendants may not, during litigation, attempt to insert the term 'trail operation' into the ROD where the Forest Service did not do so." ECF89 at 31. In these circumstances, the proper course "is to remand to the agency for additional investigation or explanation." *Fl. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1983). This Court need not, and should not reach beyond this normal remedy in the face of the ambiguity in the record. *Cf. Ctr. for Biological Diversity v. U.S. BLM*, 698 F.3d 1101, 1124 (9th Cir. 2012) ("We cannot gloss over the absence of a cogent explanation by the agency by relying on post hoc rationalizations offered by defendants in their appellate briefs."); *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 936 (9th Cir. 2010) ("fuzzy assurance[s]" cannot erase specific inconsistencies identified in the record).

### C.    The agency failed to take a hard look at impacts to elk security habitat.

LandWatch incorporates by reference the discussion of elk security habitat from its

RESP. TO OBJ. TO F&R—19
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

Objections. *See* ECF96 at 40–42. As relevant to this Response, Judge Sullivan correctly determined that the Forest Service failed to take a hard look at the OHV Project's impacts on elk security habitat by failing to account for all functionally open roads in its analysis. To put it bluntly, elk do not care what administrative designation a route receives on paper—what matters is whether a route is receiving motorized use. *See* AR5714 ("Careful assessment of how roads are being used, rather than their official status, is important to credibly evaluate effects of roads on elk and other wildlife.").

The need to factor all routes receiving motorized use into the analysis is particularly evident on this record. For example, an ODFW 3-week survey found that 60% of "administratively closed" routes had vehicle use. AR26842. Indeed, the agency itself admits that many of the 669 miles of closed roads in the Project Area "are currently receiving unauthorized OHV use." AR25472; *see also* AR26746 (ODFW noting that motorized vehicles routinely violate seasonal road closures); AR26964, 26967–68 (pictures showing "closed" roads that are clearly receiving use). Across the Project Area, "there is a growing network of user-created trails[.]" AR25303.

Nevertheless, the Forest Service did not incorporate all motorized routes into its analysis of elk security habitat, instead only accounting for open roads—862 miles. *See* AR25518.[8] The agency added the 107 miles of new OHV routes[9] to the baseline of 862 miles for its distance banding analysis, finding that there would be 42,431 acres of security habitat after Project implementation. AR25528; AR25520 (elk security habitat comprises areas "greater than ½ from any open motorized route" in blocks greater than 250 acres in size). Despite repeated comments from LandWatch and ODFW about the need to account for all routes that are receiving motorized use—regardless of administrative designation—the Forest Service refused to update the analysis. *See* AR26932 (agency's

---

[8] This figure is derived from the SFEIS road density analysis, which calculates current road density at $1.83 \text{mi}/\text{mi}^2$ in the 301,580-acre ($471.14 \text{ mi}^2$) Project Area ($1.83*471.14=862$).

[9] The remaining ~30 miles of the system would be on existing open roads. AR28734.

RESP. TO OBJ. TO F&R—20
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

analysis "underestimates the real impact"); AR26935, 26948–53; *see also* AR26739–40 (ODFW map showing roads crisscrossing every elk "security habitat" patch). This was especially problematic where the agency disclosed a "growing" network of approximately 700 miles of user-created routes, many of which are receiving motorized use. AR25532, 25303.

Defendants argue that the Forest Service's analysis was sufficient, relying on a couple of citations to the SFEIS with very general discussions of user-created routes in the Project Area. All of these cursory discussions except one are unrelated to the issue of elk security habitat. It was the agency that put the issue of security habitat on the table. *See* AR25511 (using security habitat as the primary analytical tool for measuring impacts to elk). LandWatch's claim is that the agency failed to take a hard look at impacts to elk security habitat, in particular, vis-à-vis unauthorized routes—not whether the agency analyzed user-created routes generally. *Contra* FD Obj. at 19.[10]

The only citation relevant to the discussion of elk security habitat is an acknowledgment that unregulated access would degrade security habitat by providing access into elk security cover blocks. FD Obj. at 19 (citing AR25519). It is difficult to see why this limited disclosure would satisfy the agency's "hard look" duty; if anything, it would seem to indicate that the agency **should have** accounted for user-created trails in its analysis. As Judge Sullivan observed, "general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." ECF89 at 32 (citing *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1128 (9th Cir. 2004)).

Defendants' fallback argument is that it was reasonable for the agency to exclude user-

---

[10] In citing to the generalized discussions of user-created routes, Defendants misleadingly suggest that almost half of the user-created routes are on open roads. FD Obj. at 17. The record does not support this assertion. Defendants' citation, AR25284, refers explicitly to a proposed OHV trail network mapped by one of the OHV user-groups; 40% of **these** routes (of 434 miles total) are on open roads. The Forest Service never provided evidence that most, some, or even any of the 700 miles of user-created routes it identified are on open roads.

RESP. TO OBJ. TO F&R—21
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

created routes from the distance banding analysis, citing the agency's some-day intentions to "close or conceal" an unspecified amount of user created routes under the Selected Alternative. But as Judge Sullivan pointed out, the agency did not identify "when or how this would occur." ECF89 at 24. To provide the requisite hard look, the agency could not merely rely on a "notion that an unspecified amount of user-created roads in unspecified locations in unspecified watersheds will be treated by unspecified remedial activities of unknown effectiveness at an unspecified rate under the action alternatives with funding that is not only uncertain, but that the probability of obtaining is 'outside the scope of the project.'"AR26903; *see Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1241 (9th Cir. 2005) (to comply with the "hard look" duty, the agency many not take "a soft touch or brush-off * * * negative side effects").

## II.    The Forest Service Failed to Comply with the ESA With Respect to Gray Wolves.

Defendants admit that wolves "may be present" in the Project Area because "dispersal habitat" is present. Defendants further admit that radio-collared wolves are in fact dispersing through the Ochoco and Project Area. As Defendants acknowledge, once wolf presence was determined, as here, the agency had a duty to evaluate whether the OHV Project "may affect" wolves. In defending the Forest Service's "no effect" determination, Defendants offer up factual arguments that stand contrary to the record and legal arguments that are disconnected from the governing standard. Because the OHV Project may affect wolves, the no effect determination and failure to engage in Section 7 consultation with the FWS was arbitrary and contrary to the ESA.

### A.    ESA Section 7 Consultation is required if a project "may affect" listed species.

Congress enacted the ESA to "provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered and threatened species * * *." 16 U.S.C. § 1531(b). The heart of the ESA is Section 7, which prescribes substantive and procedural duties. Substantively, a federal

RESP. TO OBJ. TO F&R—22
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

agency must "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [the critical] habitat of such species[.]" *Id.* § 1536(a)(2). To carry out this substantive mandate, a federal agency must consult with the FWS if an action "may affect" any listed species. *Id.* § 1536(a)(2)–(c); 50 C.F.R. § 402.14(a); *see also Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009).

At Step 1 of the analysis, the agency must determine if a listed species "may be present" in the action area, with input from FWS. *See* 50 C.F.R. § 402.12. At Step 2, if listed species "may be present," the agency must determine if an action "may affect" listed species or critical habitat. *Id.* § 402.14. Federal Defendants completely ignore the controlling standard articulated by the *en banc* court in *Karuk Tribe v. U.S. Forest Service*, 681 F.3d 1006 (9th Cir. 2012): "'may affect' is a relatively low threshold for triggering consultation. **Any possible effect**, whether beneficial, benign, adverse or of an undetermined character, triggers the requirement." *Id.* at 1027 (emphasis added); *Lockyer*, 575 F.3d at 1018–19 (quoting 51 Fed. Reg. at 19,926, 19,949 (June 3, 1986)).[11]

An agency may avoid the consultation requirement only if it determines that its action will have "no effect" on a listed species. 50 C.F.R. § 402.14; *Lockyer*, 575 F.3d at 1019. "[A]ctions that have **any chance** of affecting listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA." *Karuk Tribe*, 581 F.3d at 1027.

Section 7 Consultation is either "informal" or "formal." Informal consultation is a process designed to help the agency determine whether to engage in formal consultation. *See* 50 C.F.R. § 402.13. If the agency determines that the proposed action "may affect, but is not likely to adversely

---

[11] For their part, Intervenors acknowledge *Karuk Tribe*, but focus almost exclusively on dicta that is not relevant to the instant case, as described in more detail below.

RESP. TO OBJ. TO F&R—23
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

affect" listed species or critical habitat, and FWS concurs in writing, formal consultation is not required. *Id.* § 402.14(b). During formal consultation, FWS must "formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4).

> **B.** **The agency's "no effect" determination was arbitrary and capricious.**
>
> **1.** **Judge Sullivan correctly determined that the agency erroneously conflated its "may be present" and "no effect" determinations.**

If a species "may be present" in the action area, the agency must make a determination as to the potential effects of the action. Here, at Step 1, dispersal habitat is present in the Ochoco and Project Area, and the record shows that wolves are in fact dispersing through this area, as Judge Sullivan correctly found, and Defendants do not dispute. ECF89 at 15 (citing AR23788, 25479, 25477–78); FD Obj. at 4 ("No party disputes that gray wolves may be present in the Project Area."). Once wolf presence was confirmed, as here, the agency had a duty at Step 2 to determine whether the impacts of the OHV Project would cross the low "may effect" threshold.

These are two independent inquiries, but the Forest Service conflated the two, making its "no effect" determination based on the relative presence of wolves in the Project Area. In the SFEIS, the Forest Service plainly stated its no effect conclusion and supporting rationale: "Since wolves are not known to occupy habitat on the [Ochoco] the determination is "No effect" (NE) for gray wolves." AR25479. The agency's "no effect" determination therefore was premised on a non-sequitur: the "no effect" determination was made "[b]ecause wolves are not known to reproduce or persist in the [Ochoco] in general and the project area in particular[.]" AR25479. The logical extension of the agency's position is that a listed species must **occupy** a particular area before any effect can be found and Section 7 consultation duties triggered.

This was legal error because Section 7 and its implementing regulations do not distinguish

between occupied habitat and dispersal habitat. *See Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1078–79 (D. Mont. 2013) ("no effect" determination arbitrary and capricious where project would result in disturbance effects to grizzlies that did not occupy, but may travel through the project area). There is no "occupied habitat" requirement under Section 7 implementing regulations and *Karuk Tribe*; the relevant inquiry is whether a project would cause "any possible effect."

The artificial distinction between occupied and dispersal habitat is especially troubling here because for wolves, natural dispersal is key to providing the "continued expansion and ongoing genetic connectivity between wolf populations in other states and within the state." AR28547. It simply does not follow as a legal (or scientific) matter that there can be no effects to a species or its habitat unless and until occupied habitat is confirmed. Dispersal habitat is essential for wide-ranging species like the wolf.

Federal Defendants try to deflect from this error by re-writing the agency's analysis and conclusions. Without citing any record support, Federal Defendants contend that the agency's "no effect" determination actually was based on the "fact that the Project was going to be implemented in an already-disturbed area[.]" FD Obj. at 7. As the argument goes, existing roads and trails in the Project Area are part of the "environmental baseline," and need not factor into the analysis of the effects of the OHV Project "agency action." The inference is that a "no effect" determination can only occur in "undisturbed" areas.

This argument should be rejected out of hand because it is one that the agency did not make; as is well settled, agency action must be upheld, if at all, only on the basis articulated by the agency itself. *See Or. Natural Desert Ass'n*, 625 F.3d at 1120. Here, the agency's "no effect" determination was based on the lack of "occupied" habitat—not because of levels of existing disturbance.

Moreover, Federal Defendants' argument cannot be reconciled with the governing regulations and case law. The agency must evaluate the effects of the action "that will be added to

RESP. TO OBJ. TO F&R—25
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

the environmental baseline." 50 C.F.R. § 402.02. Under Section 7, it does not matter whether the effects of the new trail system will be additive to a disturbed or undisturbed baseline. Indeed, the Ninth Circuit has expressly found that a degraded baseline must be taken into account in the Section 7 analysis, to assess whether the additive impacts of an action may push a species beyond a "tipping point" beyond which it cannot recover. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 930–31 (9th Cir. 2005). A degraded baseline provides an important context for the effects analysis— not a license to ignore additive impacts.[12]

Here, the Forest Service is adding a major new trail system with 107 miles of new OHV routes. The Forest Service had a duty to evaluate whether the addition of the new trail system would pose adverse effects to dispersing wolves. *See Krueger*, 946 F. Supp. 2d at 1080 ("no effect" determination was arbitrary where the agency "failed to analyze whether the temporary increase in road density and the temporary decrease in summer secure areas during the Project's 5–10 year duration would affect transitory grizzly bears"). The Forest Service glossed over the effects determination by focusing arbitrarily on the relative degree of the species' presence.

### 2.    *Flowers* is neither controlling nor particularly helpful.

Federal Defendants' argument rests almost exclusively on *Defenders of Wildlife v. Flowers*, 414 F.3d 1066 (9th Cir. 2005), which was decided before *Karuk Tribe*, *Lockyer*, and *Kraayenbrink*. Whether *Flowers* remains good law is questionable at best. Indeed, the Circuit Court has cited *Flowers* only a handful of times, and **each time has cited the dissenting opinion**. *See Biological Diversity*, 698 F.3d at 1122 ("We have previously held that the 'may affect' standard 'must be set sufficiently low to allow Federal agencies to satisfy their duty to insure under section 7(a)(2) [that species are not jeopardized].'") (quoting *Flowers*, 414 F.3d at 1072 (Ferguson, J., dissenting) (alterations in original));

---

[12] Nor can the argument be squared with the record, which shows that wolves are actively using this "already disturbed" landscape. The question to be resolved through Section 7 consultation is the magnitude of the OHV Project's impacts on this important dispersal corridor.

RESP. TO OBJ. TO F&R—26
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

*see also Kraayenbrink*, 620 F.3d at 1210, 1211 (9th Cir. 2010) (citing *Flowers*, 414 F.3d at 1072, 1074

(Ferguson, J., dissenting)), *amended* 632 F.3d 472 (9th Cir. 2011); *Ariz. Cattle Growers' Ass'n v. Salazar*,

606 F.3d 1160, 1167 (9th Cir. 2009) (citing 414 F.3d at 1071 (Ferguson, J., *dissenting*)).[13]

In the *Flowers* dissent, Judge Ferguson took the majority to task for "ignor[ing] the plain

language of the [ESA] implementing regulations, trivializ[ing] the vital process of inter-agency

consultation, and ultimately driv[ing] closer to extinction the few existing Arizona pygmy-owls. 414

F.3d at 1071. Judge Ferguson would hold that the agency's "no effect" determination was arbitrary

and capricious because the agency failed to account for the impacts of the project on potential

habitat for the pygmy-owl. *Id.* at 1073.

Even if the majority opinion in *Flowers* remains good law, the facts of the case are materially

distinguishable. In that case, the listed species was determined not to be present. *Id.* at 1069–70; *see

also id.* at 1073 (Ferguson, J., dissenting) (citing the fact that "no Arizona pygmy-owl was physically

located in the project area or in the immediate surrounding areas" as the basis for the "no effect"

determination). Here, in contrast, wolves are in fact "present" in the Ochoco and Project Area, as

evidenced by radio-collared activity and repeated sightings. As Judge Sullivan found, the record

"contains numerous references to gray wolves' presence in the Forest. Data shows "marked

increase" in use of the Forest by gray wolves, with expanding distribution including movement

through the Forest." ECF89 at 14–15 (citing AR27023, 27041).

Federal Defendants argue that only four wolves have been "definitively identified," in the

Project Area, an attempt to trivialize the suspected presence of the species. This argument reflects a

material misunderstanding of how wolves are tracked and managed in the State of Oregon. As

amicus State of Oregon explained, only about 11% of the wolf population is fitted with a radio

---

[13] *Flowers* has been cited by the Circuit Court one other time, but only with respect to the separate issue of standing. *Defenders of Wildlife v. U.S. EPA*, 420 F.3d 946, 958 (9th Cir. 2005), *rev'd on other grounds*, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007).

RESP. TO OBJ. TO F&R—27
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

collar, and therefore, the "four tracked dispersing individuals represent only a small sample of the wolves that likely pass through and are present in the Ochoco, which is additionally supported by various sightings—including sightings of pairs and groups." ECF76 at 7 (citing AR22472, 24986, 24987, 25167, 26291, 27937, 29738). Contrary to the characterizations of the Forest Service's counsel, the tracking data establishes that "the Ochoco is an important habitat for dispersing gray wolves that are increasingly present in and around the project area." ECF76 at 7. *Flowers*—to the extent that it remains good law—therefore is materially distinguishable. The attempt to trivialize the number of wolves in these circumstances reflects the agency's lack of concern that underlies its flawed "no effects" determination.

### 3.    The Forest Service must engage in Section 7 Consultation.

Finally, Defendants argue as a factual matter that the OHV Project would neither affect wolf habitat nor wolf prey. But their arguments cannot be reconciled with the low threshold for a "may affect" determination. *See Biological Diversity*, 698 F.3d at 1122 (in challenging a "no effect" determination, plaintiffs "need only to show that an effect on listed species * * * is plausible"). By increasing motorized route densities and motorized use rates, the OHV Project has the potential to decrease prey availability and the suitability of habitat for denning, foraging, and dispersing. *See* AR26744.

Regarding impacts to wolf habitat, Defendants suggest that the OHV Project would not "substantially" increase road density. But they offer no support for the proposition that a project must cause "substantial" impacts before consultation is required. The addition of a 137-mile destination OHV trail system, with a projected 5,000 motor vehicles per year and increasing by 2.5 to 5.6 percent annually, AR25653, would "increase road densities and human use, which will decrease the suitability of habitat in the project area for wolves." AR26744; *cf. Krueger*, 946 F. Supp. 2d at 1080 ("no effect" determination arbitrary where agency failed to address "whether the

RESP. TO OBJ. TO F&R—28
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

construction and use of temporary roads during Project activities may affect grizzly bears that may travel through the area").

Regarding impacts to wolf prey, Defendants suggest that the "no effect" determination is justified on account of the agency's finding of no "population level" effects to wolf prey. Once again, Defendants ignore that the "may affect" threshold is low, and that "actions that have **any chance** of affecting listed species or critical habitat—even if it is determined that the actions are 'not likely' to do so—require at least some consultation under the ESA." *Karuk Tribe*, 681 F.3d at 1027. As Judge Sullivan observed, Federal Defendants admitted that OHV routes can affect wolves by reducing their available prey. ECF89 at 15. On a similar fact pattern, the *en banc* court in *Karuk Tribe* overturned a "no effect" determination by linking the low "may affect" threshold to the agency's admission that the agency action "'might cause' disturbance of fisheries habitat." 681 F.3d at 1027.

Defendants fall back on some communications between the Forest Service and FWS personnel. Federal Defendants claim that the "informal recommendation" from the FWS supports the Forest Service's "no effect" determination. FD Obj. at 7–8. Intervenors go a step further, suggesting that the informal communications may qualify as "informal consultation" under Section 7. The record and the law directly refute Defendants' positions.

The Forest Service's position with respect to Section 7 consultation could not be more clear: "The Forest determined that there would be no effect to wolves; as such, consultation with the USFWS was not required." AR28123; *see also* AR27939 (concluding that "consultation [is] not required"). Plainly, the agency did not engage in any type of consultation, formal or informal.

Defendants refer to 2013 email communications between an FWS biologist from the Bend Field Office, that states, "until an active pack is identified within the Ochoco NF we would recommend a no effect determination." AR16265–68. Notably, this recommendation appears to be for the "Fox Canyon Cluster Allotment Management Plan project"—not the OHV Project, which

RESP. TO OBJ. TO F&R—29
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

involves extensive motorized use within wolf dispersal habitat. Intervenors also cite a Forest Service employee's email regarding the "no effect" determination, AR28829, but do not explain how this uni-directional email somehow constitutes a "critical" two-way dialogue. *Contra* DI Obj. at 6.

Judge Sullivan correctly determined that these "informal communications" could not satisfy the Forest Service's duties under Section 7. Indeed, to qualify as "informal consultation" under Section 7, the inter-agency communications must end with "written concurrence" from the FWS "Director," which is subject to judicial review. *See* 50 C.F.R. § 402.14(b)(1); *id.* § 402.02 (defining "Director" as "the [FWS] regional director, or his authorized representative, for the region where the action would be carried out"); *see also* AR21302–07 (example of a concurrence letter). Informal consultation is a process that only occurs **after** the agency determines that a project "may affect" a listed species. 50 C.F.R. § 402.14(a). It is therefore highly ironic that Defendants hold up the communications here as possibly constituting informal Section 7 consultation over a "no effect" determination. Defendants try to have their cake and eat it, too; Section 7 consultation is not required where there will be no effect to a listed species.[14]

In sum, this is a straightforward claim controlled by Circuit precedent. The Forest Service failed to meet its burden to show that the OHV Project—with its potential to displace dispersing animals and impact wolf prey—would have "no effect" on endangered wolves. Accordingly the "no effect" determination, and consequent failure to consult under Section 7, was arbitrary and contrary to the ESA. *See Kraayenbrink*, 632 F.3d at 498 (no effect finding and resulting failure to consult were

---

[14] Defendants get hung up by the F&R's references to "formal" consultation. They argue that Judge Sullivan committed legal error by requiring "formal" consultation, where informal consultation may be an available avenue. It is clear from the context of the F&R, however, that Judge Sullivan used the term "formal" as shorthand for Section 7 consultation generally, not to distinguish between formal consultation under 50 C.F.R. § 402.14 and informal consultation under 50 C.F.R. § 402.13. Indeed, Judge Sullivan cited **both** provisions in concluding that the "Forest Service must conduct a formal consultation with the appropriate agencies regarding the effects on an endangered species." ECF89 at 16 (citing 50 C.F.R. §§ 402.13, 14).

RESP. TO OBJ. TO F&R—30
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

arbitrary and capricious in violation of agency's ESA obligations); *see also Karuk Tribe*, 681 F.3d at

1030 (agency had a duty to consult under Section 7 because action "may affect" listed species).

## III.    Remedy

The APA directs courts to "hold unlawful and set aside agency action, findings, and

conclusions found to be * * * arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2). Vacatur is the "normal remedy for unlawful agency

action[.]" *Se Alaska Conserv. Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007),

*rev'd on other grounds* 557 U.S. 261 (2009). It is rare for courts to remand without vacatur. *Humane Soc'y

v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010); *see also Cal. Cmty's. Against Toxics v. U.S. EPA*, 688

F.3d 989, 994 (9th Cir. 2012) ("[W]e have only ordered remand without vacatur in limited

circumstances[.]").

Judge Sullivan found no reason to depart from the normal remedy of vacatur in this case.

ECF89 at 49. To depart from the normal remedy, it is the agency's burden to show (1) that the

errors were not serious, and (2) that the disruptive consequences of vacatur would be severe. *Id.*

(citing *Cal. Cmty's.*, 688 F.3d at 992 (9th Cir. 2012)). As this Court has explained "courts may decline

to vacate agency decisions when vacatur would cause serious and irremediable harms that

significantly outweigh the magnitude of the agency's error." *League v. Peña*, No. 3:12-cv-02271-HZ,

2015 U.S. Dist. LEXIS 46279, at *6 (D. Or. April 6, 2015).

Here, Judge Sullivan correctly found that the agency's errors were serious: "the Forest

Service committed multiple substantive errors, as to multiple statutes, regulations, and rules."

ECF89 at 49. On a very similar fact pattern, this Court found the agency's errors were serious after

detailing "substantive and procedural flaws in the ROD and FEIS" based on violations of NEPA

and NFMA. *League*, No. 3:12-cv-02271-HZ, 2015 U.S. Dist. LEXIS 46279, at *3–4, 9. Defendants

RESP. TO OBJ. TO F&R—31
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

reiterate their belief that the Forest Service did not commit any violations of law, but do not argue that Judge Sullivan erred in finding the agency's errors to be serious.

Instead, Defendants focus all of their attention on the second prong—disruptive consequences. Judge Sullivan weighed the consequences of allowing the Forest Service to proceed against the delay of construction of the OHV routes. As to the former, Judge Sullivan noted "the potential to affect multiple environmental resources, including sensitive elk habitat," and potential impacts to Endangered wolves. ECF89 at 49–50. In contrast, Judge Sullivan found little risk of disruptive consequences or costly delay. *Id.* at 50. Judge Sullivan's F&R is fully supported by the record. On the one hand, constructing the new destination trail system would result in known "substantial negative impacts on watersheds, fish, and wildlife within the Project Area." AR26728. On the other, the alleged "benefits" of the trail system, as ODFW pointed out, rest on "speculative assumptions regarding unauthorized OHV [use]," and must be assessed in the context of the Forest Service's "history of failing to follow through on preexisting obligations to prevent unauthorized OHV use through education and enforcement." ECF54 at 18.

Defendants take issue with Judge Sullivan's balancing test, but their arguments are irreconcilable with the facts and the law.[15] On the facts, Defendants' arguments are premised entirely on their oft-cited position that building a major new destination trail system across nearly half of the Ochoco will somehow minimize the impacts of unauthorized OHV use. FD Obj. at 30–31. It is notable that Defendants cannot find sufficient support in the record to bolster their position and instead are forced to submit a post-decisional declaration. Defendants' conclusory statements about the OHV Project's alleged benefits are not entitled to deference. *See League v. U.S. Forest Serv.*, No. 3:10-cv-01397-SI, 2012 U.S. Dist. LEXIS 190899, at *9–10 (D. Or. Dec. 10, 2012) (courts do not

---

[15] Defendants also complain that Judge Sullivan did not provide the parties the opportunity to brief the issue of remedy. FD Obj. at 30. Not so. All plaintiffs briefed the issue of remedy. Defendants had every opportunity to respond in their 76-page response, but elected not to do so.

RESP. TO OBJ. TO F&R—32
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

defer to the agency at the remedy stage). And the record contradicts the idea that building a 137-mile trail network through sensitive habitats is "environmentally preferable" to the status quo.

Indeed, studies consistently have shown that OHV riders actually prefer to ride off of established trails. *See, e.g.*, AR17938 ("Riding off established roads and trails is the most preferred riding style for motorcycle and ATV owners * * *."); SUPP9364 (as many as 2/3 of study participants go off trail from time to time); SUPP10064 ("[E]ven if the 'demand' for more off-road vehicle riding opportunities is met, riders will continue to fulfill their preferences by riding off legal routes."). As ODFW pointed out, the Forest Service "fail[ed] to provide any documentation from case studies or literature that users will shift their use and behavior." AR27646. While Defendants speculate about the efficacy of monitoring and enforcement to address user-compliance, the facts show that enforcement agencies are funding-limited and unable to adequately oversee the existing OHV systems already in place. AR15226; AR17263; AR26877–81. The principal enforcement agency already has responsibility for 938 miles of designated OHV routes in Central Oregon—the ability to meet existing needs is increasingly difficult each year, even without the additional funding and enforcement personnel needed for the OHV Project. AR15231.[16]

In sum, if the agency's conclusory statements about improving the status quo actually were supported by scientific and empirical evidence, why would the OHV Project be opposed by ODFW, landowners, hunting and fishing groups, and community and conservation organizations alike? *See, e.g.*, ECF54 at 16–18 (ODFW, asserting that the selection of Alternative 5 as "environmentally preferable" was arbitrary, capricious, and not supported by the record); *see also* ECF57-1, -2, -3

---

[16] Defendants also note a very modest sum—$80,000—for trail closure and rehabilitation. FD Obj. at 31. Where the agency has an existing duty to enforce unauthorized OHV use under its Travel Management Plan, it is not clear why these funds could not simply be transferred or obtained from other sources. *See* AR26745. At a broader level, if the mere existence of a nominal sum of money to implement a project were sufficient grounds to rebut the presumption of vacatur, remand without vacatur would become an exception that would swallow the rule.

RESP. TO OBJ. TO F&R—33
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

(declarations of former Forest Service and ODFW staff, including the lead fisheries biologist of the initial planning phases of the OHV Project, attesting to concrete concerns about the degradation of fish and wildlife habitat, and the marginalization of quiet recreational opportunities).

As a legal matter, Defendants' bland protestations about the alleged "benefits" of the OHV Project over the status quo hardly rise to the level of "seriously disruptive consequences" under this Circuit's precedents. Indeed, the Ninth Circuit only has found it advisable to remand without vacatur to save a species of snail, *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 2006), to protect an entire region's power supply, *Cal. Cmtys.*, 688 F.3d at 994, and to preserve operation of the Clean Air Act in California. *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980). This is not one of those rare circumstances. Instead, vacatur would "allow[] the Forest Service to fully and meaningfully address the substantive and procedural flaws" in its decision and analysis. *League*, No. 3:12-cv-02271-HZ, 2015 U.S. Dist. LEXIS 46279, at *17.

## CONCLUSION

For all of the foregoing reasons, and those stated in its summary judgment briefing, LandWatch asks this Court to uphold the Findings and Recommendations on the elk and wolf issues, and hold unlawful and set aside the Forest Service's SFEIS and ROD and remand for compliance with NEPA, NFMA, and the ESA.

///

///

///

///

///

///

///

RESP. TO OBJ. TO F&R—34
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

DATED this 15th day of October, 2018.

Respectfully submitted,

s/ Oliver J. H. Stiefel
Oliver J. H. Stiefel, OSB # 135436
Tel: (503) 227-2212
oliver@crag.org
Christopher G. Winter, OSB # 984355
Tel: (503) 525-2725
chris@crag.org
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Fax: (503) 296-5454

*Attorneys for Plaintiff Central Oregon LandWath*

RESP. TO OBJ. TO F&R—35
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of October 2018, a true and accurate copy of Central

Oregon Landwatch's RESPONSE TO OBJECTIONS OF FEDERAL DEFENDANTS AND

DEFENDANTS-INTERVENORS was filed electronically via the CM/ECF system by the United

States District Court, District of Oregon.

DATED this 15th day of October, 2018.


/s/ Oliver J. H. Stiefel
Oliver J. H. Stiefel
  Of Attorneys for Plaintiff LandWatch

RESP. TO OBJ. TO F&R—I
*LandWatch v. Jeffries, et al.*
Case No. 2:17-cv-01091

*Crag Law Center*
*3141 E Burnside Street*
*Portland, OR 97214*
*Tel. (503) 525-2722*