IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| WILDEARTH GUARDIANS, OREGON WILD, THE SIERRA CLUB, and GREAT OLD BROADS FOR WILDERNESS, | No. 2:17-cv-01004-SU (Lead Case) |
| Plaintiffs, | |
| v. | |
| SHANE JEFFRIES, in his official capacity as Ochoco National Forest Supervisor; and UNITED STATES FOREST SERVICE, | ORDER |
| Defendants. | |
| CENTRAL OREGON LANDWATCH, an Oregon nonprofit corporation, | No. 2:17-cv-01091-SU (Trailing Case) |
| Plaintiff, | |
| v. | |
| SHANE JEFFRIES, in his official capacity as Ochoco National Forest Supervisor; JAMES M. PEÑA, in his | |

1 - ORDER

official capacity as Regional Forester for
Region 6 of the United States Forest
Service; and the UNITED STATES FOREST
SERVICE, a federal agency of the United
States Department of Agriculture,

        Defendants.

---

OREGON HUNTERS ASSOCIATION, an
Oregon nonprofit corporation,

        Plaintiff,

      v.

UNITED STATES FOREST SERVICE, an
agency of the United States Department of
Agriculture; and SHANE JEFFRIES,
Ochoco National Forest Supervisor, in his
official capacity,

        Defendants.

No. 2:17-cv-01366-SU (Trailing Case)

---

    and

OREGON TRAIL RIDERS, OREGON
MOTORCYCLE RIDERS ASSOCIATION,
PACIFIC NORTHWEST 4 WHEEL DRIVE
ASSOCIATION, DESCHUTES COUNTY 4
WHEELERS, and THE BLUERIBBON
COALITION,

        Defendant-Intervenors.

---

HERNÁNDEZ, District Judge:

    Magistrate Judge Sullivan issued a Findings & Recommendation (#89) on August 27,

2018, in which she recommends the Court grant in part and deny in part the parties' motions for

2 - ORDER

summary judgment, vacate the Forest Service's decision, and remand for further proceedings. Central Oregon Landwatch, Federal Defendants, and Intervenors have all filed timely filed objections to the Findings & Recommendation. The matter is now before me pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

When any party objects to any portion of the Magistrate Judge's Findings & Recommendation, the district court must make a *de novo* determination of that portion of the Magistrate Judge's report. 28 U.S.C. § 636(b)(1); *Dawson v. Marshall*, 561 F.3d 930, 932 (9th Cir. 2009); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

I have carefully considered all of the objections and the responses to the objections. Other than as specifically addressed below, I conclude there is no basis to modify the Findings & Recommendation. I have also reviewed the pertinent portions of the record *de novo* and find no other errors in the Magistrate Judge's Findings & Recommendation.

I. Gray Wolves

For the reasons explained by Judge Sullivan, I adopt her conclusions that the Forest Service's "No Effect" determination violated the ESA and NEPA. I clarify, however, that upon remand, the agency must properly consult with the FWS under 50 C.F.R. §§ 402.13, 402.14, meaning that it must comply with the ESA consultation requirement by formally consulting under § 402.14(a) *unless* it is excepted from formal consultation by meeting the requirements set forth in § 402.14(b) and § 402.13.

II. Elk Habitat

For the reasons explained by Judge Sullivan, I adopt her conclusions that the Forest Service violated NFMA and NEPA in regard to the elk habitat claims. In their objections, the

Federal Defendants argue that Judge Sullivan exceeded the scope of her authority under the APA by ordering the Forest Service to map calving sites and wallows upon remand. I do not read the F&R in quite the same way. In assessing whether the Forest Service complied with the Forest Plan's requirements regarding protection of elk calving sites and wallows, Judge Sullivan explained that the while the SFEIS contained some seasonal restrictions applicable to known sites, the SFEIS and ROD failed to identify where known calving sites and wallows are located or how they relate to the Project open routes. F&R at 20. She also noted the absence of maps or otherwise documented locations of specific elk wallows to which timing restrictions would apply. *Id.*; *see also id.* at 21 (noting that the SFEIS and ROD do not identify where known wallows are located or how they are located in relation to Project open routes).

Judge Sullivan acknowledged Defendants' argument that the Forest Service is entitled to deference regarding how to meet its obligations to minimize disturbances and to protect calving sites and wallows. *Id.* at 21 (further acknowledging the argument that the Forest Plan does not contain specific mandates on how the Forest Service must minimize disturbance and does not impose specific seasonal use restrictions). She explained however, that the issue was not one of scientific interpretation or judgment to which agency deference would apply. *Id.* Instead, she found that without data identifying the location of the sites, the Forest Service could not meets its obligation to protect the sites or minimize disturbance to them. *Id.*

As I understand her reasoning, Judge Sullivan found that without data regarding the location of elk calving sites and wallows, the Forest Service failed to offer a rational explanation for how the Project meets the Forest Plan's requirement to protect those sites and minimize disturbances. While I agree with Judge Sullivan that without more specific information

regarding the locations of the sites in relation to the Project's proposed designated routes, the Forest Service fails to sufficiently explain how it protects the sites and minimizes disturbances to them, I do not read the F&R as requiring actual mapping of the sites. It may be that such mapping is the best way to provide the missing explanation but there is no specific directive in the F&R that the agency *must* produce maps. The problem with the SFEIS and the ROD is the failure of a rational explanation showing how the Forest Service is complying with these particular Forest Plan directives. How the Forest Service chooses to remedy this error is not something the F&R expressly dictates.

III. Riparian Claims

For the reasons explained by Judge Sullivan, I adopt her conclusions regarding the riparian claims under NFMA and NEPA with one exception: I disagree with her finding that the Forest Service properly supported its modification of INFISH RMOs.

The Forest Service modified INFISH RMOs for woody debris, stream temperature, and width/depth ratios. Judge Sullivan agreed with the Forest Service that it provided sufficient justification for those modifications. F&R at 41-42. She explained that the Forest Service analyzed habitat indicators and used specific criteria to determine how well each indicator functioned in the watersheds. *Id.* at 42 (citing AR 25355-64). The indicators were water quality, including stream temperatures and sediment/turbidity, habitat access including physical barriers to fish passage, and habitat elements including large woody material, pool frequency and quality, and channel width/depth ratios. *Id.* She explained that the Forest Service analyzed the RMOs for stream temperature based on references concerning the size of, and average temperatures of, streams where redband trout are typically found and the average maximum temperatures suitable

for spawning. *Id.* (citing AR 25355-57). The agency modified the width/depth ratio RMO by adopting a more nuanced stream system. *Id.* (citing AR 25356-61; Supp'l AR 942). Judge Sullivan concluded that these studies provided specific data for the Forest Service, applying its expertise, to modify the RMOs under "the deferential standard." *Id.*

I agree with Judge Sullivan that the Forest Service analyzed various habitat indicators and cited to certain studies in support of the RMO modifications. If INFISH did not have more specific modification requirements, I would agree with Judge Sullivan that the agency's conclusions were supported under the deferential standard. But, I agree with Central Oregon Landwatch that INFISH mandates specific watershed or stream reach specific data supporting the change to an INFISH RMO. Because that did not occur here, the SFEIS does not comply with INFISH.

INFISH created interim RMOs[1] which are subject to modification, but only after certain prerequisites have been met. At the time they were adopted in 1995, the interim RMOs were "considered to be the best watershed scale information available.[.]" AR 2564. INFISH recognized that specific watershed or stream reach conditions based on local geology, topography, climate, and potential vegetation should be considered in refining RMOs. *Id.* It encouraged Forest Service managers "to establish site-specific RMO's through watershed analysis or site specific analysis." *Id.* INFISH requires the "completion of watershed analysis" before establishing non-interim, site-specific RMOs. *Id.* In lieu of that analysis, it also allows

---

[1] A District of Idaho decision explained that although the RMOs were considered interim in 1995, they "continue to apply[.]" *W. Watersheds Project v. United States Forest Serv.*, No. 1:15-CV-00218-REB, 2017 WL 4927660, at *5 (D. Idaho Oct. 31, 2017), *appeal filed*, No. 17-36042 (9th Cir. Dec. 27, 2017).

6 - ORDER

modification of an interim RMO in the "absence of watershed analysis where watershed or stream reach specific data support the change."  *Id.*  Thus, as I read the INFISH requirements, a Forest Service manager may replace INFISH interim RMOs with site-specific non-interim RMOs only after "completion of watershed analysis" and may modify INFISH interim RMOs for particular projects in the absence of watershed analysis only where "watershed or stream reach specific data support the change."

The SFEIS cites the interim INFISH RMOs which are relevant to the Project and redband trout.  AR 25351-52 (water temperature, bank stability, large woody debris, pool frequency).  In modifying the INFISH RMOs for large woody debris, stream temperature, and width/depth ratios, the Forest Service explained that the modified RMOs described the habitat in the Project Area better than INFISH.  AR 25351 (RMOs varied from INFISH based on studies "for RMOs [that] better describe the habitat in the project area than INFISH"); AR 26028 (acknowledging INFISH RMOs but noting that other RMOs "have been better defined for the project area").

As to large woody debris, the Forest Service modified the INFISH RMO (more than 20 pieces per mile of woody debris that is greater than 12 inches in diameter and 35 feet long), AR 2566, to one that provided for debris of the same diameter and length but increased the frequency to more than 48 pieces per mile in class IV streams and more than 69 pieces per mile in other streams.  AR 25356.  The SFEIS explained that this change was based on a 1995 study addressing "[r]eference conditions" for large woody debris documented in Oregon's Blue Mountains, which the SFEIS described as a "physiographic province more similar to the watersheds within the [Project] area."  AR 25359.

As for stream temperature, the INFISH RMO provides for no measurable increase in

7 - ORDER

maximum water temperature, with a maximum water temperature below 59°F within adult holding habitat and below 48°F within spawning and rearing habitats. AR 25352. The SFEIS explained that "[r]edband trout have been found to typically be present in small- to medium-sized streams between 50°F (10°C) and 61°F (16°C), [and] outside of this range they are less likely to be present (Meyer et al 2010)." AR 25357. The Forest Service considered that the "state of Oregon assumes that waters" with a "seven-day average maximum temperature" that does not exceed 18.0°C (64.4°F) "will provide water temperatures suitable for redband trout spawning." *Id.* Based on this information, the agency used RMOs that classified stream temperature as "Good" if its seven-day-average maximum temperature was between 10°C (50F) and 14°C (57°F), as "Fair," if it was between 14°C (57°F) and 18°C (64°F), and "Poor" if it was greater than 18°C (64°F). AR 25355, AR 25357.

As to width/depth ratios, the INFISH RMO has a width/depth ratio objective of less than ten for all stream systems regardless of specific characteristics. AR 2566. The Forest Service modified the RMO based on a study by Rosgen that identified width/depth ratios based on the type of stream. AR 25356, 2536; Supp'l AR 942.

The Forest Service's explanations for its modifications to the INFISH interim RMOs do not cite to "watershed or stream reach specific data support[ing] the change." Instead, the Forest Service cites to a study conducted in the Blue Mountains (large, woody debris), information based on state standards for streams identified as having salmon and trout rearing and migration (stream temperature), and a 1996 "Applied River Morphology" study which provided width/depth ratios based on stream type (width/depth ratio). None of these references and studies appear to have relied on data from watersheds or specific stream reaches in the Ochoco National

Forest.  Because such data is unambiguously required by INFISH before modification to an RMO may occur, the SFEIS violates INFISH.  Accordingly, I decline to adopt the portion of the F&R which found that the Forest Service complied with INFISH requirements in modifying RMOs.

CONCLUSION

Other than the clarifications provided above regarding the claims related to gray wolves and elk habitat, and other than the INFISH RMO modification claim, I adopt all of the F&R's other findings and recommended conclusions.  Thus, the Court ADOPTS Magistrate Judge Sullivan's Findings & Recommendation [89] in part, and therefore, the parties' motions for summary judgment [48, 57, 58, 69] are granted in part and denied in part as explained in the F&R and as modified herein.  The Forest Service's SFEIS and ROD at issue in these consolidated cases are vacated and remanded to the Forest Service for further proceedings consistent with the F&R and as modified herein.

IT IS SO ORDERED.

DATED this \_\_\_3\_\_\_ day of \_\_January\_\_, 2019.

_____
MARCO A. HERNANDEZ
United States District Judge